50 CCPA

**Application of Arthur P. SHEPARD.**

**Patent Appeal No. 6984.**

United States Court of Customs and Patent Appeals.

June 20, 1963.

Arnold Sprung, Burgess, Dinklage & Sprung, New York City, for appellant.

Clarence W. Moore, Washington, D. C. (George C. Roeming, Washington, D. C., of counsel), for the Commissioner.

Before WORLEY, Chief Judge, and RICH, MARTIN, SMITH, and ALMOND, Judges.

ALMOND, Judge.

This is an appeal from the Board of Appeals affirming the examiner's refusal to allow claims 28 through 39 in appellant's patent application.[1] No other claims remain in the application.

The application discloses a specified spraywelding material and its use in a spraywelding process. Claims 28 through 35 are drawn to a spraywelding powder mixture. Claims 36 through 39 are drawn to a spraywelding process.

Appellant's disclosed invention relates to a process called spraywelding. The background of this process and the problem arising therefrom is stated in appellant's brief as follows:

" * * * The spraywelding process involves the flame spraying of a powder onto a surface, such as a metal surface, followed by the melting or fusing of the sprayed material in place by heating in order to form a coating. The spraying operation serves the purpose of positioning the powder particles on the surface but a satisfactory coating is not achieved until after the fusing operation. The fusing operation, which is normally effected with the use of a torch, causes the bonding of the sprayed particles to the surface and causes these particles to melt together in the form of a homogeneous material, forming a coating layer.

"The sprayweld process constitutes a commercially used and practiced process, and did so at the time that the applicant's application was filed. As is well recognized, the spraywelding had to be effected with specific powder materials which are generally designated in the art and sold as spraywelding powders or alloys. These known spraywelding powders have a base alloy, such as a nickel base alloy, and contain a fluxing element which is generally boron. When the conventional spraywelding alloys were utilized in the spraywelding process, after the spraying operation the operator would heat the surface with the torch until the powder was completely fused, as could be determined by a glassy, shiny appearance.

"A problem existed, however, that the coating would become highly fluid and have a tendency to run and drip during the fusing operation. This tendency would prevent the build-up of substantial layer thicknesses, and due to the fluidity and surface tension, the coating would pull away from the edges, sharp corners or the like, rendering the finished product unsatisfactory."

Appellant provided a solution to the problem of running and dripping during fusing by adding a material to alter the viscosity of the sprayed layer during fusing. The material added to the coating was a second nickel base alloy having a "coalescence" temperature at least 10° F. higher than that of the self-fluxing nickel base alloy powder used in the art. The second alloy

" * * * must be of such a nature that its particles will fuse or melt together at a temperature of at least 10° F. higher than the temperature which will cause the self-fluxing sprayweld alloy to so fuse or melt together, and must be able to form a uniform alloy with the sprayweld, self-fluxing alloy within the temperature range at which the mixture will fuse together but below the temperature at which the coating will start to run and drip."

Claims 28 and 36 are representative of the material claims and the process claims, respectively, and read as follows:

"28. In a spraywelding material comprising a self-fluxing nickel base alloy powder, the improvement for

---

1. Serial No. 576,517 filed April 6, 1956, for "Spraywelding Materials."

reducing the tendency of the material to run and drip during a fusing operation which comprises at least one other nickel base alloy powder, said other nickel base allow powder being substantially completely alloyable with said self-fluxing nickel base alloy powder below the upper limit of the fusion range of said mixture, there being a temperature differential of at least 10° F. between the temperature of coalescence of the mixture component having the highest and the component having the lowest temperature of coalescence between particles of the same component, the powder mixture having a particle size below about 100 mesh with not more than about 30% below 325 mesh.

"36.   In the spray-weld process in which a self-fluxing nickel base alloy powder is sprayed onto a metal base and thereafter fused in place, the improvement for reducing the tendency of the material to run and drip during the fusing operation which comprises effecting said spraying with a mixture of a self-fluxing nickel base alloy powder with at least one other nickel base alloy powder substantially completely alloyable with the self-fluxing powder below the upper limit of the fusion range of said mixture there being a temperature differential of at least 10° F. between the temperature of coalescence of the mixture component having the highest and the component having the lowest temperature of coalescence between the particles of the same component, the powder mixture having a particle size below about 100 mesh with more than 30% below about 325 mesh, and thereafter fusing the sprayed coating to form a substantially homogeneous alloy on the base."

The sole reference relied on is:

Turner et al.    2,763,921    September 25, 1953

Turner et al. discloses materials for and a method of coating molybdenum jet engine parts to make them corrosion and impact resistant.  A mixture of two nickel-chromium alloys, having differing melting points, with particle size on the order of minus 325 mesh, is sprayed on the surface of the refractory article to be coated to protect it from oxidation. (Molybdenum melts at over 4500° F., but it may begin to oxidize at 900° F.) The coated article is heated to a temperature high enough to just melt the lower melting alloy but insufficient to melt the high melting alloy.  The higher melting particles then begin to dissolve in the liquid phase, the extent of solution being dependent upon the time of treatment. The patentees state that "the best coatings under these conditions are obtained by interrupting the firing cycle before the point of complete solution of the higher melting alloy in the lower melting alloy matrix is reached," and that "The resulting coating is then uniform, tight, and integrally bonded to the base metal." Turner et al. also states: "For best results, the coating should be applied so that the final thickness of the coating is within the range from 0.0002 inch to 0.0010 inch in thickness, with 0.0030 to 0.0040 inch thickness being an optimum range."

The reference further indicates that the method employed therein permits one "to apply thin coatings without the danger of discontinuities," and that the coatings produced are "extremely uniform."

The issues to be resolved, as aptly summarized by appellant, are whether Turner et al. forms a single homogeneous alloy, and whether the record shows that the appellant's claimed particle sizes are critical so as to patentably distinguish from the disclosure of the reference.  Both of these issues are present in the process claims, but the claims drawn to a material concern only the powder and not the resultant fused alloy.

With respect to the process of forming a homogeneous coating, the examiner rejected the claims in issue as unpatentable over Turner et al., finding that the patentee "reduced to practice coatings in which

the higher melting particles were completely dissolved."

The board sustained, holding, with reference to appellant's contention that the particles of the higher melting alloy of Turner et al. remain intact and consequently could not form a uniform or homogeneous coating, that:

> "* * * Turner et al. not only disclose that the coating is 'uniform, tight, and integrally bonded to the base metal' but in lines 64 and 75 of column 4 the fused coating is described as 'extremely uniform' hence basis for the assertion that the higher particles are retained 'intact' in the uniform coating appears totally lacking in fact."

In consideration of that phase of the stated issue relating to the forming of a single homogeneous alloy, it is pertinent to point out not only the specific teachings of the Turner et al. patent but also the reasonable inferences which one skilled in the art of spraywelding would logically draw therefrom. Emphasis is therefore warranted on such phrases of the disclosure as "temperature sufficient to just melt"; "insufficient to melt"; "under *these conditions*"; "the extent of solution being dependent upon the time of treatment"; "We have found that the *best* coatings"; "interrupting the firing cycle before the point of *complete solution*"; and "terminating * * * heating before all of * * * higher melting alloy is dissolved." (Emphasis ours.)

The conclusion seems inescapable that the quoted phrases clearly emphasize the teaching of Turner et al. that if the heat application is not interrupted and the time of treatment is sufficiently extended, the result would inevitably be the complete melting and dissolving of both nickel-chrome alloys to form a single homogeneous alloy. The modus operandi disclosed strongly supports the inference that the patentees, by extending time of treatment or increase of heat intensity, have made a very thin coating of homogeneous alloy and, by interrupting the firing cycle, have also made a coating permeated with undissolved particles of the higher melting alloy dispersed in the matrix of the lower melting alloy. The inference is just as strong that the results of the two procedures were compared by the patentees and "found that the best coatings * * * are obtained by interrupting the firing cycle * * *."

It is noted that none of appellant's claims sets forth the thickness of the coating, and none sets forth or excludes a specific atmosphere for fusing the particles on the base, and only one sets forth the material to be coated.

Turner et al. sets forth the material to be coated and discloses that the brazing operation may be carried out in a dry hydrogen atmosphere, or under vacuum conditions. The maximum time period for the operation is for a period "up to 120 minutes at temperatures from about 1800° to 2300° F." It is stated that for *best* results it was "found that the brazing temperature should be chosen so that it slightly exceeds the melting point of the lower melting alloy."

It appears, therefore, that the ranges of time and temperature are wide, allowing firing a long time at low temperature or firing a short time at a high permissible temperature. The maximum temperature may be used and may substantially exceed the melting point of the lower melting alloy. Interruption of the firing when the lower melting alloy is melted may well not prevent the complete dissolution of the higher melting alloy. In this connection the board noted that:

> "* * * while the firing or heating is interrupted before the point of complete solution of the particles of the higher melting alloy in the lower melting alloy is reached, it would appear that there is continued dissolution because the patentees in reference to the beginning of this solution of the particles of the higher melting alloys in the liquid phase state that the extent of solution is dependent upon the time of treatment * * *."

The argument presented in support of appellant's contention that the disclosure

of Turner et al. does not contemplate complete dissolution seems to us to be clearly refuted by the record. The fact that the patent indicates a preference for avoiding complete dissolution does not mean that appellant's method of completely melting all particles has not been carried out. The determination of the optimum heating time for the particular application intended is suggested by the reference and is, we think, a matter within the ability of one having ordinary skill in the art. We note, moreover, that the claims do not call for the step of completely melting all particles in the coating, but merely "fusing * * * to form a substantially homogeneous alloy * * *." We are not convinced that the "extremely uniform" coating of Turner et al. is not "substantially homogeneous."

Turner et al., in our judgment, clearly suggests to one skilled in the art that if firing is not interrupted the product will be a thin homogeneous coating. If such coating is superior for some purpose to the Turner et al. preferred incomplete fusion coating, the difference is obvious to one having ordinary skill in the art.

In our opinion the method claims, 36 through 39, define no patentable distinction over the disclosure of Turner et al.

The product claims, as well as the process claims, contain the limitation of a "powder mixture having a particle size * * * with not more than about 30% below 325 mesh." As pointed out by the solicitor, this is equivalent to requiring that at least 70% of the particles must be at least 44 microns in diameter while no more than 30% may have no limitation on the minimum of size.

Appellant assigns as error the holding of the board that his claimed particle size range did not patentably distinguish from the disclosure of Turner et al., contending that the record established the criticality of the particle size range.

In order to obtain a thin coating for application to a molybdenum base, Turner et al. specifies particles having a size of minus 325 mesh so that for best results the "final thickness of the coating is within the range from 0.002 inch to 0.010 inch in thickness, with 0.0030 to 0.0040 inch thickness being an optimum range."

The examiner found that the particle size of the powder mixture was not critical, according to the specification. Appellant submitted the affidavit of Arthur P. Shepard to support the contention that the particle size recited in all of the remaining claims is critical.

The affidavit purports to show that "a marked slag formation" occurs when powders identical except in particle size to that of the example in the instant application were sprayed on a shaft and heated. The coating formed "was highly pitted" and "the coating obtained when the powders were ground to a particle size of the order of minus 325 mesh, was not commercially acceptable." The board stated on this point:

"As to the affidavit of appellant which is relied upon as proof of such criticality, we agree with the Examiner that factually the affidavit is inconclusive for the asserted purpose, particularly as we find no basis in the disclosure to warrant consideration thereof. Moreover, the affidavit is also considered inconclusive because it is not executed by a disinterested person and as it is a direct reflection upon the validity of an issued patent hence is inadequate to overbalance the presumed correctness of the statement in the patent as granted. The Bullard Co. et al. v. Coe, 1945 C.D. 13, 573 O.G. 547 [79 U.S.App.D.C. 369], 147 F.(2d) 568, 64 USPQ 359."

We are of the opinion that the board was correct in finding that the affidavit is inconclusive. If slag formation occurred in the tests of the affidavit, it would appear that the teaching of Turner et al. was not followed, since there is no mention in Turner et al. of obtaining "highly pitted" coatings as obtained by appellant in attempting to duplicate the powder of Turner et al. Rather, Turner et al. states that the powders used produce "extremely uniform,

smooth and ductile" coatings. We are not convinced by the showing of the affidavit.

Examination of appellant's specification and original claims discloses no statement that the claimed lower range limit is critical. Appellant's averment to the contrary finds no substantial basis of support in the record. In In re Honnig, 193 F.2d 191, 39 CCPA 740, this court held that statements in affidavits cannot be substituted for proper disclosure in the application.

It is pertinent to note in this connection that appellant's specification states a *preferred* range of particle size as "100% through a 120 U.S. standard mesh, and not more than 30% through a 325 U.S. standard mesh."

This court held in In re Bourdon, 240 F.2d 358, 44 CCPA 740, that:

"While it is clear from appellant's specification that the use of rubber having a modulus of elasticity substantially higher than that of the rubber commonly used in tires is considered essential, it is not stated that the particular modulus and hardness set forth in the appealed claims are critical, but merely that they are preferable. As was held in In re Gardiner, 171 F.2d 313, 36 C.C.P.A., Patents, 748 [80 USPQ 99], values which are described in an application only as being preferred cannot ordinarily be held to be critical.

"It is well settled that proportions or values are critical only when they involve a difference in kind rather than in degree. In re [George A.] Richter, 53 F.2d 525, 19 C.C.P.A., Patents, 756 [11 USPQ 251]; * * *."

The record supports the examiner as to the noncriticality of the preferred range. The examiner noted the statement in appellant's specification that: "It is preferable to eliminate the extremely fine dust particles that are of the order of a fraction of a micron or smaller," stating that in this connection

"* * * it might be pointed out that the aperture of a 325 U.S. standard mesh (the minimum particle size of the claimed range) is of the order of 40 to 50 microns."

There is no indication that the minus 325 mesh powder of Turner et al. is "of the order of a fraction of a micron or smaller." Rather, it would appear that the powders used by appellant and Turner et al. are of the same general magnitude and differ only in degree of fineness.

We think that the record supports the statement of the board that:

"* * * We might note in this connection that the size of the particles was not considered of any importance until after the citation of the Turner et al. patent. While two of the original claims (15 and 18) did include the mesh size, the 30% recitation of the present claims apparently was not then considered of any critical significance because in claim 18 it was stated 'substantially all passing through a 325 U.S. Standard mesh.' As a matter of fact, however, we find nothing in the disclosure even suggestive of any criticality as to the size."

With reference to the affidavit of appellant relied on in support of that phase of the issue relating to criticality, we think the holding of this court in In re Shoemaker, 83 F.2d 288, 23 CCPA 1033, is apposite and dispositive. In that case the court said:

"* * * However, the question * * * must be determined from the facts disclosed in appellant's application, rather than from those which are not in harmony therewith, and which are asserted for the first time, in an affidavit of record."

Inasmuch as Turner et al. recognized the improvement of employing two nickel base alloys having different melting points in their coating composition, we find that the differences between the claims and the prior art are such

that they would be obvious to a person having ordinary skill in the art.

For the foregoing reasons, we affirm the decision of the Board of Appeals.

Affirmed.