54 CCPA

**Application of James R. COURTRIGHT.**

**Patent Appeal No. 7760.**

United States Court of Customs and Patent Appeals.

May 25, 1967.

Raymond E. Blomstedt, Wilmington, Del., (Frederick Schafer, Washington, D. C., of counsel), for appellant.

Joseph Schimmel, Washington, D. C. (Fred W. Sherling, Washington, D. C., of counsel), for the Commissioner of Patents.

Before WORLEY, Chief Judge, RICH, SMITH and ALMOND, Judges, and WILLIAM H. KIRKPATRICK.*

WORLEY, Chief Judge.

This appeal is from the decision of the the Board of Appeals affirming the examiner's rejection of claims 1, 3–5 and 8–13 in appellant's application[1] for "Aqueous Dispersion Paint Compositions" as obvious in view of certain prior art.

The invention relates to a water-base paint composition including pigment, surfactant, volatile alkali and an internally plasticized carboxyl-containing interpolymer made up of (A) 0.3-4% by weight of units of an α6-unsaturated monovinylidene carboxylic acid (e. g., acrylic acid or methacrylic acid), and (B) comple-

---

* Senior District Judge, Eastern District of Pennsylvania, sitting by designation.

1. Serial No. 66,709, filed November 2, 1960.

mentally 99.7–96% by weight of a mixture of units of (1) methyl methacrylate, and (2) one of (a) an acrylic acid ester of a $C_4$ saturated aliphatic monohydric primary alcohol (e. g., n-butyl acrylate) in the amount of 1.67–4 parts based on the methyl methacrylate weight, or (b) an acrylic acid ester of a $C_8$ saturated aliphatic monohydric primary alcohol (e, g., 2-ethylhexyl acrylate) in the amount of 1.2–2 parts based on the methyl methacrylate weight.

Claim 1 is representative of the compositions claimed:

1. A water-dilutable paint composition comprising paint pigment in the proportion of 10% to 50% pigment volume concentration based on the total non-volatile content of the paint and an aqueous dispersion of a particulate water insoluble carboxyl-containing monovinylidene ester interpolymer, at least ternary in composition, made up of 0.3 to 4% by weight of (A) units from an alpha, beta-unsaturated monovinylidene carboxylic acid, and complementally 99.7 to 96% of ester units from a mixture of alpha, beta-unsaturated monovinylidene esters consisting essentially of (B) methyl methacrylate and (C) at least one acrylic acid ester of the group consisting of a $C_4$ and $C_8$ saturated aliphatic monohydric primary alcohol, said acrylic acid ester being present in the weight ratio of 1.20 to 4 parts per part of said methyl methacrylate, said ratio being up to 2 parts when said alcohol is $C_8$ and being at least 1.67 when said alcohol is $C_4$, said aqueous dispersion paint further containing up to 5% by weight of at least one water-soluble surfactant including an anionic surfactant in the proportion of 0.3% to 5% based on the weight of said interpolymer, and a water-soluble volatile alkaline material in an amount sufficient to provide said aqueous paint with a pH in the range of 7.5 to 10, said particulate interpolymer being characterized as having an average particle-size diameter up to 0.45 micron and as coalescing from said alkaline latex at ordinary room temperature to a film having an elongation of at least 75% at 0° F.

The stated purpose of the $C_4$ or $C_8$ acrylate ester is to "plasticize" the interpolymer, with the $C_8$ acrylate having greater internal plasticizing effect than an equal weight of $C_4$ acrylate. Appellant uses his paint compositions primarily as exterior house paints where the plasticized film-forming pigment binder is said to provide durability, a practical tack temperature, and an "elongation" or distensibility sufficient to accommodate the expansion and contraction of wood surfaces over wide temperature ranges of climatic extremes, thus obviating "cracking" and "peeling." Claims 9 and 10 are directed to articles coated with the paint composition.

According to the specification, the interpolymer can be prepared

* * * by any of well known techniques of aqueous emulsion polymerization of the defined polymerizable monomer mixtures in the presence of a water-soluble catalyst for the addition polymerization and a water-soluble surfactant for emulsification and for stabilization of the resulting dispersion. * * *

While "any" water-soluble surfactant, "including anionic and non-ionic species," that is "ordinarily" used in aqueous emulsion polymerizations can be employed to prepare the interpolymer, the specification states that the polymerization is "preferably" carried out in the presence of an anionic surfactant to obtain a latex with an interpolymer particle size of less than 0.45 micron. Claims 8 and 13 are directed to the latter method.

The examiner rejected appellant's claims as obvious in view of two references:

Carlson    2,726,230    Dec.  6, 1955.
Conn et al.    2,795,564    June 11, 1957.

Like appellant, Conn discloses an aqueous paint composition containing pigment, surfactant, volatile alkali and an interpolymer film-forming material. The interpolymer, in turn, consists of (1)

0.5–2.5% by weight of an αβ-unsaturated monovinylidene carboxylic acid, with acrylic or methacrylic acids disclosed as preferred; (2) a polymerizable monovinylidene ester which by itself forms a "soft polymer," and (3) a polymerizable monovinylidene ester which by itself forms a "hard polymer." Typical of the "soft polymer" forming esters disclosed are such esters of acrylic acid as butyl acrylate, isobutyl acrylate and 2-ethylhexyl acrylate, while methyl methacrylate is given as a typical "hard polymer" forming ester. Conn chooses the amounts of "hard" and "soft" polymer forming esters according to the properties desired in the ultimate paint composition, the former ester supplying "toughness" and swelling resistance to the paint film and the latter supplying "continuity," "flexibility," and a "cohesive and adhesive" film. Conn states:

> Useful proportions of monomers characterized by forming soft and hard polymers respectively vary with the choice of these monomers. For this reason the required proportions are best defined functionally. There are considerable variations in softness and hardness produced by different members of the respective classes of polymerizable monomers. Thus, if a monomer is selected which gives a greater degree of softness than another, more of a monomer forming a hard polymer will be used to attain a given level of toughness for the final interpolymer. Conversely, *if a monomer yielding a relatively harder and, perhaps, more brittle polymer is selected, then more of a given monomer yielding soft polymers will be used,* or a monomer is selected which gives by itself an even softer polymer.

> Some typical proportions which provide a desired balance of properties in films of the interpolymers which include 0.5 to 2.5% of a defined acid are as follows, these being by weight: * * * butyl acrylate-methyl methacrylate, about 1:1; * * * isobutyl acrylate-methyl methacrylate, 3:2 to 1:1; * * * 2-ethylhexyl acrylate-

methyl methacrylate, 1:1 to 2:3; * * *. * * * It will be seen that to provide useful interpolymers the outside proportions of monomers forming soft polymers vary from about 9:1 to about 1:20. In every case, of course, the ultimate interpolymer will be formed with about 0:5% to about 2.5% of a defined carboxylate. *For the preferred situation in which the interpolymer is prepared from an ester of acrylic acid and a non-tertiary alkanol of not over 12 carbon atoms and methyl methacrylate (together with acid), the ratios vary from about 6:1 to 1:3.* * * * (Emphasis supplied.)

To prepare his interpolymer latex, Conn employs a non-ionic surfactant in the polymerization system to maintain the interpolymer particles in stable suspension. When formulating the paint composition, Conn uses a anionic surfactant to disperse the pigment material, and adds the pigment dispersion to the interpolymer latex.

Noting the absence of disclosure in Conn of the use of anionic surfactants in his aqueous emulsion polymerization process, the examiner turned to Carlson, who discloses that various cationic, anionic, or non-ionic surfactants may be used in aqueous emulsion copolymerization systems to form polymer latexes containing 1–30% acrylic or methacrylic acid and 70–99% alkyl acrylates.

The examiner pointed out that Conn discloses ranges of proportions of ester monomers (6:1 to 1:3, alkyl acrylate: methyl methacrylate) in his interpolymers which are somewhat broader than the range of proportions claimed by appellant (4:1 to 1.2:1, alkyl acrylate: methyl methacrylate). He saw "no patentable distinction" between appellant's compositions and those of Conn. With respect to the process claims, the examiner thought "it would be obvious to use the anionic surfactant of Carlson instead of or along with the non-ionic surfactant of Conn et al in their polymerization process." The board agreed, finding that "appellant's composition and process

would have been obvious, for the reasons the Examiner gives, from the references."

Appellant's arguments here are twofold: (1) The claimed compositions are unobvious because they differ in composition from Conn's specific paint formulations and are substantially superior thereto; (2) the use of an anionic surfactant in the polymerization process in order to obtain a polymer particle size range essential to appellant's product is also unobvious.

In support of argument (1), appellant submitted an affidavit to establish the criticality of the claimed acrylate monomer proportions in relation to the specific acrylate: methacrylate rations disclosed by Conn. The compositions compared were as follows:

|  | Conn | Appellant |
|---|---|---|
| n-butyl acrylate | 1 (49.25 parts) | 1.67 (61.6 parts) |
| methyl methacrylate | 1 (49.25 parts) | 1 (36.9 parts) |
| 2-ethylhexyl acrylate | 1 (49.25 parts) | 1.2 (53.7 parts) |
| methyl methacrylate | 1 (49.25 parts) | 1 (44.8 parts) |

In addition to the recited acrylate and methacrylate portions, each polymer also contained 1.5 parts of methacrylic acid. We note that appellant employs in his compositions somewhat larger amounts of n-butyl acrylate and 2-ethylhexyl acrylate in relation to methyl methacrylate than does the specific disclosure of Conn.

According to the affidavit, the polymers themselves, as well as paints formulated from the polymers, were coated on various substrates, and thereafter were exposed to outdoor and accelerated weathering tests. In general, an examination of the weathered panels showed the specific compositions of Conn to be brittle and susceptible to cracking and peeling, while appellant's specific compositions remained flexible and adherent without cracking or peeling.

In view of those results described in the affidavit, appellant argues that the examiner and board erred in regarding it as "immaterial" to patentability of the composition claims. While there is some indication that the examiner took such a position,[2] the board properly did not. Rather, the board examined the results shown by the affidavit in light of the disclosure of Conn, and concluded that appellant's affidavit and argument "pass over" the teachings of Conn of "how the

---

2. The examiner did state:

Applicant * * * shows that compositions which contain 1 part methyl methacrylate to 1.67 parts butyl methacrylate are superior to the composition of Conn * * * who specifically shows the maximum ratio of one part methyl methacrylate to one part of butyl acrylate. The affidavit also shows that the claimed composition of one part of methyl methacrylate to 1.2 parts of 2-ethylhexyl acrylate are superior to the Conn * * * composition which specifically recites a ratio of one part methyl methacrylate to one part of 2-ethylhexyl acrylate. The affidavit was not considered to carry any weight * * * [and] the fact that applicant obtains better results from the claimed proportions of monomers in the polymer over the specific ranges disclosed by Conn * * * is immaterial for the reason that Conn * * * broadly discloses the claimed proportions of monomers. * * *

One of the reasons given by the examiner for his conclusion, however, was that Conn

* * * is not limited to the specific proportions set out * * * since said specific proportions merely appear to be exemplary of the broad proportions * * *. *The specifically claimed proportions could be arrived at [by] practicing the teachings of Conn * * *.* (Emphasis supplied.)

ratio of comonomers may be changed to get changes in the final polymer, including changes of adhesion."

■ It is true, as appellant contends, that this court has often stated that *unexpected* or *unobvious* properties of a composition are part of "the subject matter as a whole" to be considered under 35 U.S.C. § 103. Appellant's reliance on such cases here, however, appears misplaced, for we think, contrary to his argument, that there is substantial evidence of record to support the finding by the board, if not the examiner, that the properties of appellant's compositions are *not* unexpected or unobvious. While appellant is correct in his argument that Conn does not explicitly disclose his paint compositions, the inquiry should not stop there. The question remains as to what one of ordinary skill in the art would learn from the Conn disclosure when considered as a whole.

The solicitor points out that:

* * * [Conn has stated] specific requirements which apply to interior house paints,[3] namely, toughness and resistance to swelling in water, resistance to stains, and ability to withstand wet scrubbing * * *. Appellant is more interested in elongation or stretchability of the paint film as an exterior house paint where swelling of the substrate is more likely to occur due to extreme changes in temperature and moisture content, and where the paint film must stretch to remain intact as the substrate swells * * *.

It seems to us that it would not be expected that Conn's paints, if they are primarily intended for indoor use, would endure outdoor weather conditions relatively well, or would have the requisite flexibility to cope with expansion and contraction of the substrate resulting from temperature extremes. If one of ordinary skill in this art were to find that some specific examples of Conn led to polymers which flaked, cracked and were too brittle to withstand outdoor use, we do not think he would have any difficulty in following the directions Conn gives to correct those deficiencies, namely "if a monomer yielding a relatively harder and, perhaps, more brittle polymer is selected, then more of a given monomer yielding soft polymer will be used."

■ It appears that appellant's compositions are more durable because of their higher content of acrylate monomer in the polymer binder and their concomitant greater ability to flex under temperature extremes. We think Conn would make one skilled in this art aware of the fact that use of more "soft," plasticizing acrylate monomer in the specific interpolymers of Conn would result in greater flexibility and a decrease in hardness and brittleness.[4] One cannot ignore the broader, instructive disclosure of a reference at the expense of reliance only on the specific examples, where the broader disclosure teaches how to modify the exemplary compositions to produce certain desired results. We are satisfied that the affidavit, in the apt words of the

---

3. Appellant stated below that Conn relates to paint compositions "primarily intended for more or less protected indoor use," although we note that Conn also discloses that films of paint prepared in accordance with the directions in his specification "have been exposed outdoors for over six months without cracking or peeling."

4. Appellants acknowledge here that "the existence of hard and soft acrylic monomers and their general effects upon interpolymer properties were well known as early as 1942, as shown by the Renfrew patent U.S. 2,270,024," a reference submitted by them to the board. Renfrew discloses polymerizing 2-ethylhexyl methacrylate with methyl methacrylate to obtain a flexible polymer useful in "water paint," and states that

* * * as the percentage of 2-ethyl hexyl methacrylate increases the interpolymers become more flexible and also more sticky. If the interpolymer contains less than 40% of 2-ethyl hexyl methacrylate it is deposited * * * in the form of powdery brittle flakes * * *; above 40% and up to 95% the interpolymers adhere readily * * * in film form, an emulsion containing 70% depositing a non-tacky film which is particularly suitable for coating or surface dressing * * *.

solicitor, "simply shows results which would be expected from the use of more pliable interpolymers," and that appellant's compositions and coated articles would be obvious to one of ordinary skill in the art in view of Conn.

 Appellant further urges that Conn requires a non-ionic surfactant in his aqueous emulsion polymerization process. He argues that it would be unobvious to employ an anionic surfactant in the polymerization process as he has done. The apparent reason appellant utilizes an anionic surfactant is to obtain an interpolymer particle size below 0.45 micron. While appellant contends that the disclosed particle size range is critical, nothing in the specification or record demonstrates that to be the case or, for that matter, that appellant's particle size range differs in any respect from that of Conn. As the solicitor points out, appellant's composition claims do not require that the interpolymer be formed in a process utilizing an anionic surfactant, but only recite a paint dispersion "including an anionic surfactant," a recitation met by the Conn disclosure of employing anionic surfactants to disperse the pigment before adding the pigment to the latex. With respect to appellant's process claims, we agree with the examiner and board that the record evidence, notably Carlson, demonstrates that it would be obvious to one of ordinary skill in the art to employ an anionic surfactant in place of the non-ionic surfactant used by Conn in his aqueous emulsion polymerization process. The mere fact that appellant discloses that use of the anionic surfactant in the process is "preferable" to him does not ordinarily support a conclusion of criticality. See In re Shepard, 319 F.2d 194, 50 CCPA 1439, and cases cited therein. Indeed, the portions of the specification quoted earlier which refer to the acknowledged state of the art would appear to negate the criticality alleged.

The decision is affirmed.

Affirmed.