In the Matter of the Application of
Barney J. MAGERLEIN.

Appeal No. 79–523.

United States Court of Customs
and Patent Appeals.

July 5, 1979.

Robert A. Armitage, Kalamazoo, Mich., atty. of record, for appellant.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents; Jack E. Armore, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, RICH, BALDWIN, and MILLER, Associate Judges, and COWEN,* Senior Judge.

MILLER, Judge.

This is an appeal from the decision of the Patent and Trademark Office ("PTO") Board of Appeals ("board") affirming the rejection under 35 U.S.C. § 103 of claims 27–41. We reverse.

*Background*

Employing the synthesizing methods of the prior art (hereinafter "Corey"),[1] appellant has synthesized C–16 dimethyl homo-

---

\* The Honorable Wilson Cowen, United States Court of Claims, sitting by designation.

1. Corey, "Stereo-Controlled Synthesis of Prostaglandins $F_{2\alpha}$ and $E_2$ (*dl*)," 91 *J.Am.Chem.* Soc'y 5675–77 (1969), was cited by the examiner for disclosing the prior art methods. Patents No. 3,778,450 and No. 3,901,923 issued to Udo F. Axen on December 11, 1973, and August 26, 1975, respectively, were cited for disclosing the

logs of natural prostaglandins.[2] Appellant's synthesis uses chemical intermediates

which are dimethyl homologs of the Corey intermediates. These intermediates are the

Typical Claimed Intermediate

Corresponding Corey Intermediate

---

subject matter of the claims on appeal.[3] The Corey intermediates are productive of

compounds used as intermediates in the Corey synthesis. These prior art compounds will be referred to hereinafter as the "Corey intermediates."

2. Natural prostaglandins found in the human body are useful biological compounds which act as regulators of muscle activity, lipid metabolism, and certain aspects of the reproductive system. *The Condensed Chemical Dictionary* 737 (8th ed. 1971). Structurally, the natural prostaglandins are fatty acids of twenty carbon atoms characterized by a cyclopentane ring and two side chains attached to adjacent positions on the ring: (1) a carboxy-terminated side chain of seven carbon atoms, and (2) a hydroxy-substituted side chain of eight carbons. The carboxy group (–COOH) is at the C–1 *position; the cyclopentane ring constitutes positions* C–8 to C–12 (counting from the attachment of the carboxy-terminated chain to the attachment of the hydroxy-substituted chain); and the hydroxy group (–OH) is attached on the other side chain at position C–15. The structure of appellant's homologs of *the natural prostaglandins, which are depicted infra,* have a dimethyl group (CH$_3$     CH$_3$) attached at the C–16 position.

3. Claim 27 is illustrative of the claims on appeal:

An optically active compound of the formula

pharmaceutically useful prostaglandins,[4] and appellant's intermediates are produc-

or a racemic compound of that formula and the mirror image thereof,

wherein E is O =,

or

; and

wherein R$_4$ is

(1) 

$(T)_s$ ,

wherein T is alkyl of one to 4 carbon atoms, inclusive, phenylalkyl of 7 to 10 carbon atoms, inclusive, or nitro, and s is zero to 5, inclusive, provided that not more than two T's are other than alkyl, and that the total number of carbon atoms in the T's does not exceed 10 carbon atoms;

(2) 

$COOR_6$ ,

wherein R$_6$ is alkyl of one to 4 carbon atoms, inclusive;

(3) 

$(T)_s$

$(T)_s$

wherein T and s are as defined above; or

(4)  acetyl.

4. The Corey intermediates directly yield prostaglandins F$_{2\alpha}$ ("PGF$_{2\alpha}$") and E$_2$ ("PGE$_2$"); prostaglandin A$_2$ ("PGA$_2$") is prepared from

tive [5] of pharmaceutically useful C--16 dimethyl homologs (already the subject of three United States patents [6]) of these prostaglandins:

Typical Claimed Intermediate

16,16-dimethyl-PGF$_{2\alpha}$
(U.S. Patent 3,954,833)

16,16-dimethyl-PGE$_2$
(U.S. Patent 3,903,131)

16,16-dimethyl-PGA$_2$
(U.S. Patent 3,892,795)

It is noted that the only structural difference between the claimed intermediates and the Corey intermediates is the dimethyl group at the C–16 position and that appellant concedes that his claimed intermediates would have been prima facie obvious over the prior art Corey intermediates. Also noted is that the only difference between appellant's patented end products and the Corey end products is this same dimethyl group. However, appellant relies upon an affidavit by André Robert and the several patents granted on appellant's 16, 16-dimethyl prostaglandin end products as evidence of the unexpectedly superior pharmaceutical activity of these end products. Moreover, because of the position taken by the PTO at oral argument,[7] we may assume, for purposes of this appeal, that appellant's end products are unexpectedly superior to the Corey prostaglandins from which they are structurally obvious.

In the proceedings before the PTO, appellant argued that evidence showing that his claimed intermediates were productive of a

PGE 2 by dehydration under acid conditions. The structures of these prostaglandins differ from one another structurally only by differing substituents on the cyclopentane ring at the C–9 to C–11 positions:

PGF$_2\alpha$

PGE$_2$

PGA$_2$

5. The number of steps from appellant's intermediates to his end products is from two to six, depending upon the desired end product prostaglandin. However, the dimethyl group at the C–16 position, as well as adjacent carbon atoms, remains unchanged during these steps.

6. Appellant's invention of the intermediates claimed in the application on appeal was contemporaneous with his invention of the patented end products, being originally disclosed in appellant's application serial No. 133,842, filed April 12, 1971, now abandoned. The issued patents were all granted on related continuation, continuation-in-part, or divisional applications of serial No. 133,842 and are all assigned to The Upjohn Company.

7. At oral argument, the Solicitor conceded that appellant's end products exhibit unexpected activity over the Corey end products. Before the board, the examiner indicated that the superiority of appellant's end products is of "an unexpected order."

surprisingly and unexpectedly improved series of prostaglandin-like substances should be viewed as establishing the nonobviousness of his claimed intermediates.[8]

### Board's Action

The issue presented to the board by appellant was:

Does evidence of surprising and unexpected properties for the pharmacologically useful end products of non-intrinsically useful[9] chemical intermediates rebut the prima facie structural obviousness of such intermediates.

With one member dissenting, the board concluded that such evidence could not be used to rebut the prima facie case of obviousness.

After discussing three decisions of this court considered to be relevant—In re Widmer, 353 F.2d 752, 53 CCPA 762, 147 USPQ 518 (1965); In re Druey, 319 F.2d 237, 50 CCPA 1538, 138 USPQ 39 (1963); In re Surrey, 319 F.2d 233, 50 CCPA 1336, 138 USPQ 67, cert. denied, 375 U.S. 930, 84 S.Ct. 332, 11 L.Ed.2d 264, 139 USPQ 566 (1963)— the majority concluded that Druey and Surrey, which was decided concurrently with and adopts the reasoning of Druey, were more relevant to the case on appeal than Widmer. The majority observed that, as in Druey and Surrey, the end products of the claimed intermediates are pharmaceutical drugs; that no showing of any unexpected activity or property in the claimed intermediates, as such, had been made;[10] and that, as in Druey, no other use for the claimed intermediates was disclosed in the record. It concluded that the evidence of unexpected properties in the end products "is even more remote from the claimed intermediates, because the claimed intermediates are at least two steps removed from the final pharmaceutical compound, whereas the in-

termediates in Surrey and Druey were only one step removed." The majority continued:

Prima facie, all the compounds of appellant's reaction scheme are obvious from the analogous compounds of the prior art reaction scheme. If any particular compound is compared with its prior art analog and shown to be possessed of unexpected properties, the granting of a patent on that particular compound may be justified. However, a showing with respect to one compound should not necessarily create a family of patents, including precursors two or more steps removed. There are numerous expressions to the effect that the sins of the fathers are visited upon the children but we are not aware of any adage to the effect that the virtues of the children are visited upon the grandfathers and more remote ancestors. [Footnote omitted.[11]]

Also, because the claimed intermediates can be used to prepare more than one prostaglandin homolog, the majority indicated concern that, if one or more of the prostaglandin homologs were held to be unpatentable, a patent on the intermediates would be a bar to the use of such intermediates to prepare unpatentable end products.

Emphasizing the mandate of section 103 to consider the "subject matter as a whole," the dissenting board member concluded that the legal guidance of Widmer is more pertinent than that of Druey and Surrey, and, therefore, that the evidence of the nonobviousness of the end products is, in this case, persuasive of the nonobviousness of the claimed intermediates. He noted that there is no evidence to support the theory that any of the final products capa-

---

**8.** The record contains substantial evidence showing that the claimed intermediates and the Corey intermediates have no known utility other than as chemical intermediates. Appellant argues, therefore, that no meaningful comparison between these intermediates, as such, can be made to demonstrate unexpected results.

**9.** The term "non-intrinsically useful" is used to denote the absence of any direct meaningful or practical usefulness of the chemical intermediates, as such, notwithstanding their indirect

usefulness as intermediates in the production of pharmaceutically useful end products.

**10.** The majority said that, in order to rebut the prima facie case of obviousness, case law requires such a showing.

**11.** More accurately, the analogy would be that the virtues of the children are found in the grandfathers and more remote ancestors.

ble of being made from the claimed intermediates are or may be unpatentable and that, on the contrary, the only identified end products are the subject matter of issued patents.

## OPINION

This court has considered the issue, as stated by the board, on at least four previous occasions: *In re Widmer, supra; In re Druey, supra; In re Surrey, supra*; and *In re Finley,* 174 F.2d 130, 36 CCPA 998, 81 USPQ 383 (1949). In *Druey,* with a factual situation similar to that of the instant case,[12] the court rejected an argument that "since the only use disclosed for their [appellants' claimed] compound I is as an intermediate for direct production of [an end product] sulfa compound II, the 'best evidence' which may be submitted under the circumstances of this case is a showing of the unexpected property of the sulfa compound II, as compared to one made from the reference [intermediate] compound III." 319 F.2d at 240, 50 CCPA at 1542, 138 USPQ at 41. Citing *In re Finley, supra,* the court said that the proper standard "requires the verified showing to 'relate to the utility of the compound actually being claimed instead of some derivative thereof,' and that 'if the claimed compound itself is not tested to show superior properties, an explanation as to why it is necessary to test a derivative should be made of record.'" *Id.* 319 F.2d at 240–41, 50 CCPA at 1542, 138 USPQ at 41. The court concluded that appellants had not complied with such requirements:

> Appellants have made no showing that the claimed intermediate has any unexpected properties, and have given no reason why the compound itself was not tested. We find no reason why the unexpected therapeutic properties of the sulfa

---

12. In *Druey,* the appellant claimed a compound I which was used as an intermediate in the preparation of a sulfa drug II:

$H_2N-$ (pyrazole ring with $N$, $N$, $C_6H_5$)

**I**

$H_2N-$ (benzene ring) $-SO_2-NH-$ (pyrazole ring with $N$, $N$, $C_6H_5$)

**II**

The prior art reference disclosed compound III and taught that it could be used to prepare sulfa drug IV:

$H_2N-$ (pyrazole ring with $-CH_3$, $N$, $N$, $C_6H_5$)

**III**

$H_2N-$ (benzene ring) $-SO_2-NH-$ (pyrazole ring with $-CH_3$, $N$, $N$, $C_6H_5$)

**IV**

An examination of these compounds indicates that the only difference between the claimed intermediate I and the prior art intermediate III was a methyl group ($-CH_3$), and that a methyl group is also the only difference in the respective end products II and IV. Thus, in *Druey* as in the present appeal, the difference between the claimed and prior art intermediates is the same as the difference between the respective end products. Further similarities between the two cases are that in *Druey*: (1) the PTO conceded that appellants' end product II was unexpectedly superior to the prior art end product IV; (2) the "sole use disclosed in the [*Druey*] specification for the claimed compound [I] is an intermediate for the preparation of the . . . [patented end product II]"; and (3) the known uses of the end products are as pharmaceutical drugs. *See* 319 F.2d at 238–39, 50 CCPA at 1539–40, 138 USPQ at 40.

drug should necessarily relate back to the intermediate, or why such properties must necessarily be attributable to one of the reactants from which it was prepared. The record shows that the therapeutic properties here belong to the sulfa drug, not to any of the compounds used in its preparation. Appellants' affidavit, therefore, fails to establish that the claimed compound has any unobvious or unexpected property, hence fails to rebut the prima facie showing of obviousness over the prior art.

*Id.,* 319 F.2d at 241, 50 CCPA at 1542, 138 USPQ at 41–42. Judge Smith dissented, arguing that he could "conceive of no more convincing proof of unexpected and unobvious properties of the claimed intermediate than to show those unexpected and unobvious properties of the sulfa drug made therefrom." *Id.,* 319 F.2d at 242, 50 CCPA at 1543–44, 138 USPQ at 42.

The court in *Widmer* stated that *Druey* and *Surrey* must *not* "be read to establish a hard and fast rule that evidence of unexpected properties of the end-product is wholly irrelevant, and therefore inadmissible, on the issue of non-obviousness of an intermediate." 353 F.2d at 759, 53 CCPA at 771, 147 USPQ at 525. The court then distinguished *Druey* and *Surrey* on the ground that the end products in those cases were pharmaceutical drugs. The court remarked that a pharmaceutical drug is "of such nature as to be unpredictable in its action" and that since "the action of drugs is generally highly specific, it can fairly be said that tests on the end-product drugs may not be relevant, and thus [would be] inadmissible, to show non-obviousness of intermediates." *Id.*

The *Widmer* court found that the affidavit evidence, which showed that the cured end products produced from the claimed monomers (intermediates) were unexpectedly superior in "thermic aging" tests to the corresponding cured end products from the prior art monomers, was sufficient to rebut the prima facie case of obviousness. The court was satisfied that "one of ordinary skill in this art would ascribe to the mono-mers the *contributing cause* for the difference in the cured products." (Emphasis added.) *Id.,* 353 F.2d at 760, 53 CCPA at 771, 147 USPQ at 525. Therefore, the rejection of the claims to the intermediates was reversed because the unexpectedly superior property of the end products was persuasive of the nonobviousness of the claimed intermediates, which were the "contributing cause" of that unexpected property of the end products.

■ The requirement of section 103 that "the subject matter as a whole" be considered in determining whether that subject matter "would have been obvious at the time the invention was made" also supports the conclusion that evidence of an unexpectedly superior activity or property of an end product may, under appropriate circumstances, be considered in the determination of the nonobviousness of the claimed intermediate. Applying this requirement to chemical cases, the court in *In re Papesch,* 315 F.2d 381, 391, 50 CCPA 1084, 1097, 137 USPQ 43, 51 (1963), made it clear that a relevant property of a compound cannot be ignored in the determination of nonobviousness:

> From the standpoint of patent law, a compound and all of its properties are inseparable; they are one and the same thing. . . . the patentability of . . . [a chemical compound] does not depend on the similarity of its formula to that of another compound but of the similarity of the former compound to the latter. There is no basis in law for ignoring *any* property in making such a comparison. [Emphasis added.]

*Accord, In re Lunsford,* 357 F.2d 380, 384, 53 CCPA 986, 992, 148 USPQ 716, 720 (1966).

■ Accordingly, we are persuaded that the capacity of an intermediate to contribute to an end product that feature which causes the end product to possess an activity or property that is unexpectedly superior to that of a prior art end product is a "property" that inures to the benefit of the intermediate and that can be considered as part of the "subject matter as a whole"

in determining the nonobviousness of the intermediate. *In re Widmer, supra; Commissioner v. Deutsche Gold-Und-Silber-Scheideanstalt,* 130 U.S.App.D.C. 95, 111, 397 F.2d 656, 672, 157 USPQ 549, 563 (1968).[13] In other words, the "contributing cause" test is met when one of ordinary skill in the art would reasonably ascribe to a claimed intermediate the "contributing cause" for such an unexpectedly superior activity or property. *In re Diamond,* 360 F.2d 214, 219, 53 CCPA 1172, 1178, 149 USPQ 562, 566 (1966).

Nevertheless, such a "property" of the intermediate cannot be considered in isolation, but must be weighed along with all other relevant properties (both expected and unexpected) in the determination of the nonobviousness of the intermediate. *See In re May,* 574 F.2d 1082, 1094, 197 USPQ 601, 609 (CCPA 1978); *In re Nolan,* 553 F.2d 1261, 1267, 193 USPQ 641, 645 (CCPA 1977).

▮ Although we agree with the "contributing cause" test of *Widmer,* we consider too arbitrary the basis for its attempt to distinguish *Druey* and *Surrey.*[14] That the unexpectedly superior activity or property of an end product has to do with a pharmaceutical utility is an insufficient justification for *precluding* a determination that the claimed intermediate is the "contributing cause" of the end product's unexpectedly superior activity or property.[15] Although the action of many pharmaceuticals, as well as many chemical compounds, is "unpredictable" and "generally highly specific," such factors will be reflected in the

evidence required to meet the "contributing cause" test. In order to establish that the claimed intermediate is the "contributing cause" of the unexpectedly superior activity or property of the end product, an applicant must identify the cause of the unexpectedly superior activity or property (compared to the prior art) in the end product and establish a nexus for that cause between the intermediate and the end product. Obviously each case must be decided on its own facts.

▮ Appellant has established that the dimethyl group at the C–16 position in his patented end products—the sole difference between his patented end products and those of Corey—is the feature that causes his patented end products to possess unexpectedly superior activity over the Corey end products. He has further established that the dimethyl group at the C–16 position is present in the claimed intermediates and remains unchanged through the conversion steps from the claimed intermediates to the end products.[16] Moreover, in this case, there is further reason for considering the effect of the dimethyl group in appellant's patented end products in determining the nonobviousness of the claimed intermediates, namely: the *only* structural difference between the claimed intermediates and the Corey intermediates is this same dimethyl group.

▮ Although the record establishes that there is no known (or suspected) utility for the claimed intermediates other than as

13. *Cf. In re Huellmantel,* 324 F.2d 998, 51 CCPA 845, 139 USPQ 496 (1963); *Parker v. Marzall,* 92 F.Supp. 736, 86 USPQ 446 (D.D.C. 1950); *Ex parte Brody,* 122 USPQ 611 (P.O.Bd. App.1959).

14. In light of our disagreement with the *Widmer* court's basis for distinguishing *Druey* and *Surrey,* to the extent that this opinion is inconsistent with *Druey* and *Surrey,* those cases are overruled.

15. Our recent statement in *In re Gyurik,* 596 F.2d 1012, 1018 n.14, 201 USPQ 552, 558 n.14 (Cust. & Pat.App.1979), that the "mere ability of a compound to act as an intermediate toward the production of other compounds does not alone constitute the sort of 'property' that

the cases on obviousness of chemical compounds contemplated" should not be read out of context as suggesting that the capacity to react to produce another compound is not, ipso facto, a property. The statement is merely a recognition that there is no common-properties presumption or evidence of motivation to make the intermediate from the mere fact that an intermediate is in the chain of production of another compound.

16. The mere fact that there are two to six steps in the conversion from the claimed intermediates to the various end products does not preclude satisfaction of the contributing cause test.

intermediates, the board suggests that there are "properties" (*e.g.,* stability, toxicity, reactivity, or yield) with respect to which appellant might make a comparison between the claimed intermediates and prior art intermediates. It refers to the two cited Axen patents (*see* note 1, *supra* ), which show that the novel Axen intermediates are crystalline and, thus, advantageously more stable than prior art compounds that were oils.[17] To the extent that the board would require appellant to compare the *intrinsic* properties of the claimed and prior art intermediates in order to rebut the prima facie case of obviousness, we disagree.[18] One compound's stability or crystalline form is unexpectedly better than that of another compound only in connection with a specified use or environment. For example, according to Axen, his novel crystalline intermediates are readily purified by recrystallization, "thereby leading to prostaglandins of high purity"; also, the enhanced stability of the Axen intermediates "thereby lead[s] to final product prostaglandins in greater yield at reduced cost." The properties suggested for comparison by the board are relevant (to a determination of nonobviousness) only in connection with the production of, or the method of producing, the end product prostaglandins.[19]

■ Therefore, since the record discloses no other properties with respect to which a meaningful comparison of the claimed and prior art intermediates can be made, the evidence of the claimed intermediates' capacity to contribute to the end products that feature which causes the end products to possess an unexpectedly superior activity is persuasive of the nonobviousness of the claimed intermediate compounds.

In view of the foregoing, we hold that the PTO's prima facie case of structural obviousness has been rebutted.

The rejection of claims 27–41 is reversed.

*REVERSED*

---

**17.** The specification of Axen patent No. 3,778,-450 states:

> I have found, surprisingly, that the novel intermediates of this invention are generally crystalline materials, unlike the prior art materials which are usually oils. The present intermediates are, therefore, readily purified by recrystallization if desired, thereby leading to prostaglandins of high purity. Furthermore, I have found that certain of these intermediates, e. g. the Formula VII aldehydes, have greatly enhanced stability over prior art comparable compounds, and thereby lead to final product prostaglandins in greater yield at reduced cost. Furthermore, among the numerous advantages over the prior art, the use of these intermediates, e. g. the Formula VIII compounds wherein $R_2$ is benzoyl, results unexpectedly in a higher ratio of desired alpha-isomer Formula IX product to beta-isomer Formula IX product than by use of prior art intermediates.

**18.** We agree with appellant's statement in his brief that—

> where a novel chemical intermediate is productive of a novel end product, which end product is in turn distinctive from the end products of the prior art intermediate, then the comparison of intrinsic properties of the intermediates does *not* serve as a useful measure of the desirability or distinctiveness of one intermediate's use vis-a-vis the other—nor does such an exercise serve any other purpose.

**19.** Similarly, that one compound may have a different boiling point, specific gravity, solubility, or hardness compared to another compound would not mean that one compound is any better or any worse than the other, absent some particular use or environment for the compounds in which those intrinsic "properties" can be compared.