**In re David H. CLEMENS, Marvin J. Hurwitz, and Robert W. Walker.**

**Appeal No. 79–595.**

United States Court of Customs and Patent Appeals.

June 12, 1980.

John F. Witherspoon, Washington, D. C., attorney of record for appellant; Michael B. Fein, and Louis F. Kline, Jr., Philadelphia, Pa., of counsel.

Joseph F. Nakamura, Washington, D. C., for the Commissioner of Patents and Trademarks; Gerald H. Bjorge, Washington, D. C., of counsel.

Before MARKEY, Chief Judge, and RICH, BALDWIN, MILLER and MALETZ, Judges.*

MALETZ, Judge.

This is an appeal from the decision of the United States Patent and Trademark Office (PTO) Board of Appeals (board) sustaining the examiner's rejection under 35 U.S.C. § 103 of claims 1–10 of application serial No. 641,464, filed December 17, 1975, a continuation-in-part of application serial No. 428,968, filed December 27, 1973, for "Method of Purifying Condensate Water for Steam Regenerating Equipment." We *modify.*

* The Honorable Herbert N. Maletz, Judge, United States Customs Court, sitting by designation.

## Background

### Invention

Appellants' claimed process is for removing corrosion products from condensate waters in a steam regenerating system, i. e., a system in which steam, after passing through a steam turbine to generate electricity, is recycled as condensate to a boiler. This purification process, called condensate polishing, utilizes strong base ion exchange resins derived from crosslinked vinylbenzyl chloride, hereinafter referred to as VBC-based resins, to remove small amounts of dissolved solids from the condensate.

The following claims are before us on appeal:

1. A process for removing corrosion products from high pressure boiler condensate waters at elevated temperatures which comprises contacting the waters containing the corrosion products with a mass of crosslinked vinylbenzyl chloride strong base ion exchange resin, wherein the crosslinker is a polyvinyl compound.

2. A process as claimed in Claim 1 wherein the waters are passed through the resins at flow rates between 30–100 gal/min/sq. ft.

3. A process as claimed in Claim 1 wherein the corrosion products comprise dissolved metal hydroxides and hydrous oxides.

4. A process as claimed in Claim 2 wherein the corrosion products contain magnetite.

5. A process as claimed in Claim 1 wherein the resins are gellular instructure [sic].

6. A process as claimed in Claim 1 wherein the resins are macroreticular in nature.

7. A process as claimed in Claim 1 which additionally includes a cation exchange step.

8. A process as claimed in Claim 1 wherein the boiler condensate waters are at a temperature in excess of 100°C when

contacted with the strong base ion exchange resin.

9. A process as claimed in Claim 1 wherein the crosslinker is divinyl benzene.

10. A process as claimed in Claim 1 wherein the crosslinker is present in an amount of from about 1% to about 10% by weight of the resin.

## Prior Art

The VBC-based resins used by appellants are very similar structurally to prior art resins, referred to as CME-based resins, which are derived from styrene-divinyl benzene polymers that have been chloromethylated with chloromethyl ether. The differences between the VBC-based resins and the CME-based resins result from the method of attaching the chloromethyl groups to the aromatic rings of their polymeric backbones. In preparing VBC-based resins, the polymer is formed from monomers which have the chloromethyl group already attached to the aromatic ring. On the other hand, in preparing CME-based resins, the polymer is formed first and the chloromethyl groups are added later. These differences in preparation are thought to result in differing degrees of secondary crosslinking in the polymer.

The PTO has cited the following four references: Rieman,[1] which describes VBC-based resins; Kun et al.[2] and Kressman et al.[3] which disclose treatments of boiler feed waters with CME-based resins, and Otis,[4] which allegedly equates boiler feed water treatments with condensate water treatments. We need not discuss these references further, however, since appellant has simplified the matter before us by acknowledging that the following are prior art:

(1) VBC-based resins per se;
(2) the use of VBC-based resins generally for ion exchange purposes;
(3) CME-based resins per se;
(4) the use of CME-based resins generally for ion exchange purposes; and
(5) the use of CME-based resins specifically for condensate polishing.

Notwithstanding this prior art, appellants claim that there was a serious drawback in the use of CME-based resins for condensate polishing. More specifically, appellants represent that in order to avoid the thermal degradation of these resins during condensate polishing, it was necessary to cool the hot condensate to below 60°C before treatment. This representation is substantiated by product brochures for CME-based resins which are sold by appellants' assignee. For these brochures specify that the maximum temperature at which the hydroxide form[5] of these resins can be used is 140°F (60°C).

## Barrett Reference

The PTO has also relied on a United States patent issued to Barrett.[6] This patent has an earlier effective filing date than appellants' application. Also, the Barrett patent and appellants' application have a common assignee.

The Barrett patent describes a macroreticular polymer of crosslinked vinylbenzyl chloride which can be used to make VBC-based resins. The patent discloses and claims the polymer itself (claims 1–8), the process of making the polymer (claims 9–

1. U.S. patent to Rieman, No. 3,179,703, issued April 20, 1965, for "Removal of Phenols from their Aqueous Solutions with Low-Capacity Ion-Exchange Resins."

2. U.S. patent to Kun and Kunin, No. 3,454,493, issued July 8, 1969, for "Process and Product for Removing Colloidal Materials from Aqueous Media."

3. British patent specification of Kressman and Millar, No. 860,695, published February 8, 1961, for "Improvements relating to Ion-Exchange Processes."

4. U.S. patent to Otis, No. 1,582,300, issued April 27, 1926, for "Process and Apparatus for Purifying Blown-Off Boiler Water."

5. In condensate polishing, the hydroxide form of the ion exchange resin is required. U.S. patent to Barrett, *infra* n.6, col. 2, lines 2–6.

6. U.S. patent to Barrett, No. 3,843,566, filed April 16, 1973, and issued October 22, 1974, for "Macroreticular Vinyl Benzyl Chloride Polymers."

13), the process of making VBC-based resins from the polymer (claims 14–19), the VBC-based resins derived from the polymer (claim 20), and the process of using these VBC-based resins (claims 21 and 22). The process-of-using claims are drafted broadly, and set forth a process for removing a component from a liquid by treating the liquid with the claimed resin.[7]

The Barrett patent specifically mentions condensate polishing in the following paragraphs in the specification describing the prior art:

> The polymers produced by such a prior art process are, after conversion, used to form ion exchange resins. Such known resins although satisfactory for many ion exchange utilizations have been criticized as being too fragile in certain fields of use. Areas of ion exchange resin use such as the removal of strong acids or weak acids from aqueous solution, as done in *condensate polishing*, nuclear loop water treatment or continuous ion exchange processes as practiced for example in sugar refineries, require resins which must possess long term resistance to degradation in functionality. Resistance to degradation during high temperature operating conditions is also important for good resin performance. Heretofore, a resin with a satisfactorily high column capacity was invariably too vulnerable physically for high stress operations such as the continuous ion exchange processes mentioned hereinbefore. [Col. 1, lines 43–58] [Emphasis added.]

\* \* \* \* \* \*

Another resin characteristic important in determining durability of a resin is its ability to withstand thermal degradation. This characteristic is normally termed thermal stability. Anion exchange resins in the hydroxide form are particularly susceptible to thermal degradation. Their short effective life in use areas *such as boiler steam condensate purification*, where the hydroxide form is required and high temperatures prevail, contributes substantially to the cost of their operation. [Col. 1, line 69—Col. 2, line 6] [Emphasis added.]

The Barrett disclosure also refers to tests run to compare the thermal stability of the claimed VBC-based resins with corresponding CME-based resins. Barrett sums up the results as follows: "The results indicate that VBC resins have consistently greater thermal stability than the corresponding CME resins." *Supra* n.6, col. 8, lines 6–8.

### Rule 131 Declaration

In order to remove Barrett as a reference, appellants filed a declaration under 37 CFR 1.131.[8] In the declaration, they de-

---

7. Claims 21 and 22 of U.S. patent to Barrett, *supra* n.6, read as follows:

 21. A process of removing a component from a liquid which comprises treating the liquid with an ion exchange resin as claimed in Claim 20.

 22. A process as claimed in Claim 21 *wherein the ion exchange resin is a strong base anion exchange resin.*

8. § 1.131 Affidavit or declaration of prior invention to overcome cited patent or publication.

 (a) When any claim of an application is rejected on reference to a domestic patent which substantially shows or describes but does not claim the rejected invention, or on reference to a foreign patent or to a printed publication, and the applicant shall make oath or declaration as to facts showing a completion of the invention in this country before the filing date of the application on which the domestic patent issued, or before the date of the foreign patent, or before the date of the printed publication, then the patent or publication cited shall not bar the grant of a patent to the applicant, unless the date of such patent or printed publication be more than one year prior to the date on which the application was filed in this country.

 (b) The showing of facts shall be such, in character and weight, as to establish reduction to practice prior to the effective date of the reference, or conception of the invention prior to the effective date of the reference coupled with due diligence from said date to a subsequent reduction to practice or to the filing of the application. Original exhibits of drawings or records, or photocopies thereof, must accompany and form part of the affidavit or declaration or their absence satisfactorily explained.

scribed three studies conducted at their direction prior to the filing date of the Barrett patent. These studies were designed to investigate the relative ion exchange capacities and thermal stabilities of various VBC- and CME-based resins. Summary reports and laboratory notebook pages documenting these investigations were submitted. Appellants maintained that this showing effectively removed Barrett as a prior art reference under 35 U.S.C. § 103 by establishing that appellants made their invention prior to the filing date of the application which resulted in the Barrett patent.

### Rebuttal Evidence

Two of the studies described in appellants' Rule 131 declaration were designed to compare the thermal stability of VBC-based resins used in the claimed process with closely-related CME-based resins used in prior art condensate polishing.

The results from these tests showed that at 110°C and 130°C the VBC-based resins were more thermally stable. In fact, at 110°C the VBC-based resins had 48% longer half-lives than their CME-based counterparts. Appellants argued that these results demonstrated an unexpected superiority of the claimed process.

### Examiner's Rejections

Initially, the examiner made four separate rejections. First, claims 1–10 were rejected under 35 U.S.C. § 112 for being vague and indefinite. Second, claims 1–8 and 10 were rejected under 35 U.S.C. § 112 for being broader than the disclosure. Third, claims 1–6 and 8–10 were rejected under 35 U.S.C. § 103 for being obvious from Kun in view of Rieman and Otis with Kressman being additionally applied as to claim 7. This third rejection is hereafter referred to as the CME rejection. Fourth, claims 1–10 were rejected under 35 U.S.C. § 103 for being obvious from Barrett—a rejection which will be referred to hereafter as the Barrett rejection.

The rejections under 35 U.S.C. § 112 were ultimately withdrawn by the examiner but both the CME and Barrett rejections were maintained. In response to appellants' argument that the Barrett rejection was overcome by the Rule 131 declaration, the examiner explained:

Barrett is applied as a reference, not under 35 U.S.C. § 102(e), but because he is the prior inventor of the claimed subject matter. Since Barrett invented the claimed composition, it would be logically inconsistent that Clemens et al invented the process of using the composition prior to Barrett inventing the composition per se. The composition's utility, use in boiler steam condensate purification, is seen to be a part of Barrett's invention. The composition was invented to withstand the high pressure (stress) and elevated temperatures of boiler condensate water (Barrett, column 1, lines 49, 53, 54, 57, 61, 62, 66, and 67 and column 2, lines 3 and 4). As such, Barrett's utility and composition are seen to be integral one with the other. Moreover, as outlined in MPEP 804.03, appellants are seen to have constructively elected Barrett as the prior inventor because of the common assignment of Barrett and the instant application and the fact that the assignee has accepted a patent on the Barrett invention.

Although the § 112 rejections were withdrawn, one remark made by appellants in regard to these rejections is relevant to the issues presented in the case at bar. In response to the examiner's argument that the claim limitations "elevated temperature" and "high pressure" were vague and indefinite, appellant stated:

The terms "elevated temperatures" and "high pressure" both relate to condensed water derived from a boiler and are found in the preamble to Claim 1. As such, these terms do not relate to limitations on the present invention but on the known process for producing steam for use in a steam turbine system to generate electricity.

### Board's Opinion

The board affirmed both the CME rejection and the Barrett rejection. It pointed

out that the rebuttal evidence submitted by appellants was only directed at establishing the nonobviousness of employing the VBC-based resins at temperature of 110°C and above whereas the claims were broad enough to cover treatments at lower temperatures, e. g., 60°C the maximum recommended for CME-based resins.

With regard to whether Barrett was available as a reference against appellants' claims the board stated:

> The fact that Barrett did not claim the use of his resin for condensate polishing is irrelevant. A patent is *prima facie* evidence of inventorship of everything both disclosed and claimed by patentee. *Considering*, then, that Barrett *not only* discloses and claims aminating vinyl benzyl chloride (VBC) polymers to form strong base anion exchange resins, but also describes steam-boiler condensate polishing as a specific utility for such resins, we conclude that Barrett is *prima facie* available for the 35 U.S.C. § 103 rejection.

> Under such circumstances, we do not think that a 37 CFR 1.131 showing which swears back of the filing date of the patent is a proper vehicle for removing the reference as prior art. Cf. *In re Facius*, 408 F.2d 1396, 56 CCPA 1348, 161 USPQ 294 (CCPA, 1969). There is no showing here that patentee derived his knowledge that VBC anion exchange resins were useful in condensate, polishing operations from appellants. There must be sufficient evidence to establish that appellants are the prior inventors of the subject matter disclosed in the patent to Barrett. This is especially true where, as here, the present application and Barrett are coassigned and presumably assignee has possession of the necessary evidence to establish inventorship. Thus, we conclude that appellants have not sustained their burden of proving facts sufficient to remove the *prima facie* availability of the Barrett reference.

*Appellants' Argument*

Appellants maintain that they have established the nonobviousness of the claimed invention by demonstrating that it possesses unexpected superior results over the closest prior art, condensate polishing with CME-based resins. They submit that in view of the known chemical similarity between VBC-based resins and CME-based resins one skilled in this art would have expected the two to have the same physical characteristics and functionality, and that therefore, appellants' discovery that VBC-based resins were substantially superior in condensate polishing at high and moderate conditions would have been unexpected and surprising.

In response to the board's criticism of the temperatures at which the comparative tests were run, appellants stated: "[T]here is nothing in the showing which negates the advantage of the VBC resins over the CME resins at even 60°C, although it would be readily apparent to those skilled in the art that temperatures such as 110°C and 130°C are the most desirable for high pressure condensate water polishing."

With regard to the Barrett rejection, appellants contend that the Barrett patent does not evidence Barrett's invention of VBC-based resin condensate polishing. They stress that this is not the subject matter which Barrett claims. Pointing out that condensate polishing is only referred to in Barrett's specification, they argue that this unclaimed disclosure of Barrett has been removed as prior art under 35 U.S.C. § 103 by their Rule 131 declaration.[9] They therefore assert that it was error for the board to rely on this portion of Barrett's specification as prima facie evidence of prior inventorship, and submit that the fact that Barrett's patent is commonly assigned with appellants' application should not negate the application of Rule 131.

Appellants attempt to distinguish this court's decision in *In re Bass*, 59 CCPA

---

9. Because of our analysis and holding in regard to the Barrett rejection, infra, we need not reach the issue of whether a declaration submitted under 37 CRF 1.131 is an appropriate response to a rejection such as the Barrett rejection here.

1342, 474 F.2d 1276, 177 USPQ 178 (1973),— which is the source of the 35 U.S.C. §§ 102(g)/103 type rejection the PTO seems to be making here. They note that in *Bass* the prior art relied on under 35 U.S.C. § 103 by reason of 35 U.S.C. § 102(g) was subject matter which was claimed, as well as disclosed, in a patent to another. Appellants urge that we should not extend the *Bass* decision to cover the situation presented in the case at bar, wherein the PTO is relying on unclaimed subject matter in an issued patent to establish a prior invention.

### Solicitor's Argument

The solicitor asserts that appellants' rebuttal evidence is not commensurate in scope with the claims because it is inconclusive of unexpected results at temperatures of less than 110°C, and with VBC-based resins that are not gellular. He also contends that this evidence is flawed because it was not derived from tests run at operating conditions. In this regard, he notes that the hot condensate used in these tests did not contain corrosion products.

With regard to the Barrett rejection, the solicitor maintains that the board's finding that Barrett invented condensate polishing with VBC-based resins is supported by Barrett's discussion of the desirability of his novel resins in the field of condensate polishing.

The solicitor argues that appellants have not proved sufficient facts to remove Barrett as a reference. He notes that appellants' declaration and accompanying exhibits neither establish that appellants are the prior inventors of the subject matter disclosed in the Barrett patent, nor that Barrett derived his knowledge that VBC-based resins were useful in condensate polishing from appellants. Additionally, the solicitor asserts that appellants' Rule 131 showing does not establish a reduction to practice of appellants' claimed invention prior to Barrett's filing date since the reported tests did not involve the removal of corrosion products from the hot condensate.

Because the record does not contain information on the invention date of Barrett's

macroreticular VBC-based resin and his process of using the same, the solicitor suggests that this case be remanded to the board for a more focused inquiry should we find it necessary to reach this question.

### OPINION

#### I. CME Rejection

##### A. Claims 1–7 and 9–10

The condensate polishing process set forth in claims 1–7 and 9–10 differs in only one respect from prior art condensate polishing. That is, the claimed process utilizes VBC-based resins, whereas the prior art used CME-based resins. These two kinds of resins have very similar structures, and both parties maintain that one skilled in this art at the time this invention was made would have expected them to have similar physical characteristics and utilities. In fact, appellants concede that substituting the one for the other in condensate polishing would have been prima facie obvious.

Appellants, however, argue that this prima facie case has been rebutted by a showing of unexpected results. In support of this contention, they rely on comparative testing which demonstrates that VBC-based resins are significantly more thermally stable than corresponding CME-based resins at 110°C and 130°C.

■ In order to establish unexpected results for a claimed invention, objective evidence of non-obviousness must be commensurate in scope with the claims which the evidence is offered to support. *In re Greenfield*, 571 F.2d 1185, 1189, 197 USPQ 227, 230 (CCPA 1978); *In re Lindner*, 59 CCPA 920, 923, 457 F.2d 506, 508, 173 USPQ 356, 358 (1972); *In re Tiffin*, 58 CCPA 1420, 1421, 448 F.2d 791, 792, 171 USPQ 294 (1971).

Applying this rule to appellants' claims, we note that claims 1–7 and 9–10 cover VBC-based resin condensate polishing "at elevated temperatures." During prosecution of their application, appellants' attorney defined the term "elevated temperatures" as those temperatures at which prior

art condensate polishing was done. Since the prior art's CME-based resin condensate polishing was conducted at temperatures below 60°C, these claims must be construed to include in their coverage condensate polishing performed at such temperatures. Thus, the scope of the temperature limitation in claims 1–7 and 9–10 is very broad.

The probative value of appellants' evidence, on the other hand, in quite narrow. Appellants' evidence comes solely from comparative tests conducted at 110°C and 130°C.

This is not a case in which the probative value of a narrow range of data can be reasonably extended to prove the unobviousness of a broader claimed range. Cf. *In re Kollman*, 595 F.2d 48, 56, 201 USPQ 193, 199 (CCPA 1979), where it was held that the unobviousness of a broader claimed range was proven by a narrower range of data, when one having ordinary skill in the art could ascertain a trend in the exemplified data which would allow him to reasonably extend the probative value thereof. Here, the claimed range includes temperatures below 60°C, temperatures at which CME-based resins would be expected to perform well. Appellants' tests, however, only compare VBC- and CME-based resins at temperatures at which the latter would be expected to perform poorly. There is therefore no basis in this data for predicting the relative performance of VBC- and CME-based resins at temperatures at which the latter would be expected to perform well.

Accordingly, we conclude that the evidence of unexpected results was not commensurate in scope with the breath of these claims.

B. *Claim 8*

Claim 8 includes the additional limitation that the condensate polishing be performed at a temperature in excess of 100°C. As we explained above, the close structural similarity between the VBC- and CME-based resins would have led one skilled in this art at the time this invention was made to expect them to have similar physical characteristics and utilities. One such physical characteristic, known to the prior art, is the tendency of CME-based resins to thermally degrade at temperatures in excess of 60°C. This knowledge, that CME-based resins have poor thermal stability at temperatures above 60°C, would have dissuaded one skilled in this art from using VBC-based resins at temperatures above 100°C. Notwithstanding appellants' concession, therefore, it would appear that the high temperature process of claim 8 would not have been prima facie obvious from the prior art viewed as a whole. Since the PTO had not made out a prima facie case of obviousness respecting claim 8, evidence of comparative testing was unnecessary in rebuttal.

II. *Barrett Rejection*

In the case at bar, the PTO has also rejected all the appealed claims under 35 U.S.C. § 103 over the invention disclosed in the commonly assigned Barrett patent. In regard to this rejection, there has been a great deal of debate, both before us and in the proceedings below, concerning the question: What does the Barrett patent evidence Barrett to have invented? In view of the considerable attention the parties have paid to this issue, we begin our consideration of the Barrett rejection with a discussion of this point.

A. *What Did Barrett Invent?*

The board ruled that everything disclosed in the Barrett patent was prima facie invented by Barrett, and, therefore, concluded that Barrett invented condensate polishing with macroreticular VBC-based resins. Appellants dispute this finding. They maintain that only Barrett's *claims* constitute evidence of what Barrett invented, and argue that since Barrett did not claim condensate polishing with macroreticular VBC-based resins, he should not be considered its inventor. In our opinion, neither of these positions is entirely correct.

We cannot agree with the board's proposal that a patentee be considered the prima facie inventor of everything disclosed in his patent. The first paragraph of 35

U.S.C. § 112 [10] requires that, in addition to a description of the invention, an applicant include in his patent specification a description of "the manner and process of making and using [the invention]," and a description of "the best mode contemplated by the inventor of carrying out his invention." Compliance with these provisions may sometimes require disclosure of matter (e. g., starting materials) not invented by applicant.

The board's ruling is also incompatible with the PTO's suggested guidelines for preparing patent specifications. Section 601 of The Manual of Patent Examining Procedure (MPEP) [11] instructs an applicant to set forth in his specification the background of the invention including a description of the prior art. Typically, this portion of a patent specification describes inventions made by persons other than the applicant.

 Nor can we agree with appellants' position, that only Barrett's *claims* constitute evidence of what Barrett invented. It is true that appellants are correct in noting that it is the claims which define "the sub-ject matter which the applicant regards as his invention," 35 U.S.C. § 112 (second paragraph).[12] However, it does not follow from this that the specification should be ignored in determining what a patentee invented. To the contrary, it is a fundamental principle of patent law "that claims are to be construed in the light of the specifications and *both* are to be read with a view to ascertaining the invention." *United States v. Adams*, 383 U.S. 39, 49, 86 S.Ct. 708, 713, 15 L.Ed.2d 572 (1966) [Emphasis added.]

Applying this principle to the case at bar, it is to be observed that while Barrett claims the use of his macroreticular VBC-based resins only generally for ion exchange purposes, in his specification he indicates that condensate polishing is one such area of ion exchange. It follows from this that Barrett intended condensate polishing to fall within the scope of his broad process-of-using claims. In short, when Barrett's process-of-using claims are construed in light of this portion of the specification, we conclude that Barrett appears to have invented condensate polishing with macroreticular VBC-based resins.[13]

10. § 112. Specification
 The specification shall contain a written description of the invention, and of the manner and process of making and using it, in such full, clear, concise, and exact terms as to enable any person skilled in the art to which it pertains, or with which it is most nearly connected, to make and use the same, and shall set forth the best mode contemplated by the inventor of carrying out his invention.

11. MPEP 601 (3rd ed. Rev. 52, Apr. 1977), which is based on 37 CFR 1.51, provides, in pertinent part:
 601 Content of Application
 * * * * * *
 GUIDELINES FOR DRAFTING A MODEL PATENT APPLICATION
 The following guidelines illustrate the preferred layout and content for patent applications. These guidelines are suggested for the applicant's use.
 * * * * * *
 (d) *Background of the Invention*: The specification should set forth the Background of the Invention in two parts:
 (1) Field of the Invention: A statement of the field of art to which the invention pertains. This statement may include a para-phrasing of the applicable U.S. patent classification definitions. The statement should be directed to the subject matter of the claimed invention.
 (2) Description of the Prior Art: A paragraph(s) describing to the extent practical the state of the prior art known to the applicant, including references to specific prior art where appropriate. Where applicable, the problems involved in the prior art, which are solved by the applicant's invention, should be indicated.

12. § 112. Specification
 * * * * * *
 The specification shall conclude with one or more claims particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention.

13. Additionally, Barrett's report of superior thermal stability is part of his composition invention, the properties of a composition being part of "the subject matter as a whole." *In re Magerlein*, 602 F.2d 366, 372, 202 USPQ 473, 478–79 (CCPA 1979); *In re Murch*, 59 CCPA 1277, 1283, 464 F.2d 1051, 1056, 175 USPQ 89, 92 (1972); *In re Courtright*, 54 CCPA 1379, 1383, 377 F.2d 647, 651, 153 USPQ 735, 738 (1967); *In re Papesch*, 50 CCPA 1084, 1097, 315 F.2d 381, 391, 137 USPQ 43, 51 (1963).

But even if we agreed with the PTO that Barrett invented condensate polishing with macroreticular VBC-based resins, its Barrett rejection must be reversed for the reasons set forth below.

## B. Foundation for 35 U.S.C. §§ 102(g)/103 Rejection

In setting forth the Barrett rejection, both the examiner and the board rejected the claimed invention under 35 U.S.C. § 103 for being obvious from the invention of another (Barrett) who had not abandoned, suppressed or concealed it. 35 U.S.C. § 102(g). Limited approval of this sort of 35 U.S.C. §§ 102(g)/103 rejection was first expressed by this court in its decision in *In re Bass, supra*. In *Bass*, this court held that "the prior invention of another who had not abandoned, suppressed, or concealed it, *under the circumstances of this case* which include the disclosure of such invention in an issued patent, is available as 'prior art' within the meaning of that term in § 103 by virtue of § 102(g)." 59 CCPA at 1355, 474 F.2d at 1286–87, 177 USPQ at 186 [Emphasis added.] The "circumstances of * * * [the *Bass*] case," however, differ from the facts before us now in two significant respects.

### (1) Evidence of Priority

The circumstances of the *Bass* case included clear and conclusive evidence of priority. In this connection, statements made in the affidavits filed and accepted under Rule 131 and statements made by attorneys for Bass during prosecution established that the prior invention [14] had been reduced to practice before the earliest alleged conception date for the Bass appellants' invention. 59 CCPA at 1356, 1359, 474 F.2d at 1287, 1289, 177 USPQ at 186–87, 188. In the case

at bar, however, there is no such evidence in the record concerning the order in which the inventions in question were made.

Despite the absence of such evidence, both the examiner and the board determined that everything Barrett disclosed in his specification was invented by him prior to the invention of what appellants here claim.[15] The examiner concluded that Barrett had to have been the prior inventor because "it would be logically inconsistent that * * * [appellants] invented the process of using the composition prior to Barrett inventing the composition per se."

The problem with this reasoning is that the "composition per se" invented by Barrett was *macroreticular* VBC-based resins. On the other hand, appellants' claims, except claim 6,[16] include in their coverage the process of using *gellular* VBC-based resins as well. And, because gellular VBC-based resins were known prior to Barrett's discovery, there is nothing inconsistent about appellants having invented the process of using VBC-based resins in condensate polishing before Barrett invented the macroreticular VBC-based resin composition. In fact, appellants allege that their original work was done with gellular VBC-based resins.

On this issue of priority, the board took a different approach from that of the examiner and placed the burden on appellants to prove that Barrett was not the prior inventor. The board rationalized that the present application and Barrett are coassigned and that the assignee had possession of the necessary evidence to establish priority of inventorship.

In *Bass*, this court specifically held that a commonly assigned patent having an earlier

---

14. In *Bass*, the PTO cited as prior art two allegedly prior inventions, one disclosed in a patent issued to Jenkins and the other disclosed in a patent issued to Bass and Horvat. The court, however, held that priority had been established only for the Jenkins' invention.

15. Their rationales differ somewhat. Inasmuch as the board did not specifically reverse the examiner, both positions are before us. *In re Halliwell*, 53 CCPA 1112, 1114, 358 F.2d 1008, 1010, 149 USPQ 511, 512 (1966).

16. Claim 6 is limited to condensate polishing with *macroreticular* VBC-based resins. With regard to this claim, the examiner's reasoning is sound, i. e., it would be logically inconsistent that appellants invented the process of using macroreticular VBC-based resins prior to Barrett inventing the macroreticular VBC-based resins themselves.

filing date did not in and of itself establish priority of invention.[17] Judge Rich, in the principal opinion, declared: "We do not think it was incumbent on the applicants to prove it was *not* prior, merely because the Patent Office thinks it might have been." 59 CCPA at 1356, 474 F.2d at 1287, 177 USPQ at 187 [Emphasis in original.] This statement is merely an application of the basic rule that "any proper rejection involving section 102(g), whether or not combined with section 103 * * *, must be based upon evidence of an invention prior to that of the applicant." *In re Bulloch*, 604 F.2d 1362, 1366, n.12, 203 USPQ 171, 174 (CCPA, 1979).[18] That Barrett's patent is coassigned with appellants' application does not alter this rule.

Aware of the dearth of evidence regarding priority in the record before us, the solicitor suggests that we remand the case to the board for further inquiry into when Barrett made his invention, employing, for example, the provisions of 37 CFR 1.78(c).[19] However, under the statute, 35 U.S.C. § 144, we are required to review the board's entire decision on the record before us. Further proceedings in the PTO are matters for PTO election, the statute merely requiring that any such proceedings be governed by this court's decision. Because the record does not support a finding that Barrett made his invention before appellants made the invention of claims 1–5 and 7–10, the present 35 U.S.C. §§ 102(g)/103 rejection of those claims must fall.[20]

### (2) *Knowledge of Other Invention*

An additional factor which distinguishes *Bass* from the case at bar is the *Bass* applicants' knowledge of the prior invention. In *Bass*, it was clear that at least one of the three Bass co-inventors had knowledge of the prior invention before the making of the *Bass* invention. (The sole inventor of the prior invention was a co-inventor of the *Bass* invention.) In the case at bar, however, there is no evidence of record that any of the appellants had knowledge of Barrett's invention prior to the making of their own invention.[21]

Under 35 U.S.C. § 103, obviousness is determined with reference to "a person having ordinary skill in the art to which said subject matter pertains." In effect, the *Bass* decision imputed to such a person the applicant's own knowledge of another's prior invention. In the case at bar, however, the PTO is imputing to this "person having ordinary skill in the art" knowledge which has not been shown to have been known to either the public or the applicants. We do not consider such an extension of the *Bass* holding to be warranted.

Where an applicant begins with knowledge of another's invention that will be available to the public at a later date as a result of an issued patent, treating this other invention as prior art is justified under facts such as those in *Bass.* No such consideration is present when the applicant does not begin with such knowledge. To

---

**17.** This holding was made in connection with the cited Bass and Horvat invention, for which the only evidence of priority was an earlier filing date.

**18.** Of course, an earlier filing date can be one of several bits of evidence which together establish priority, as was the case with the cited Jenkins' invention in *Bass.*

**19.** § 1.78 Cross-references to other applications.

 \* \* \* \* \* \*

 (c) Where two or more applications, or an application and a patent naming different inventors and owned by the same party contain conflicting claims, the assignee may be called upon to state which named inventor is the prior inventor. In addition to making said statement, the assignee may also explain

why an interference should be declared or that no conflict exists in fact.

**20.** The PTO is of course free to make another rejection, after this decision, should it develop facts that would render such a rejection justifiable. See *In re Ruschig*, 54 CCPA 1551, 1555, 379 F.2d 990, 993, 154 USPQ 118, 121 (1967); *In re Arkley*, 59 CCPA 804, 810, 455 F.2d 586, 589, 172 USPQ 524, 527 (1972). As was noted in *Arkley*, " \* \* \* it is the Patent Office which grants patents, not this court." 59 CCPA at 810, 455 F.2d at 589, 172 USPQ at 527.

**21.** This deficiency in the PTO's determination applies to the rejection of all of the appealed claims.

the contrary, where this other invention is unknown to both the applicant and the art at the time the applicant makes his invention, treating it as 35 U.S.C. § 103 prior art would establish a standard for patentability in which an applicant's contribution would be measured against secret prior art. Such a standard would be detrimental to the innovative spirit the patent laws are intended to kindle. Inasmuch as there are no competing policy considerations to justify it, as there is in the case of § 102(e) prior art [22] and lost counts,[23] we decline to establish such a standard here.

**22.** The contents of a secret co-pending patent application are made available as prior art within the meaning of that term in 35 U.S.C. § 103 by virtue of 35 U.S.C. § 102(e) as of the application's filing date in order to ensure that the speed at which the PTO performs its functions is not a factor which determines patentability. See *Hazeltine Research Inc. v. Brenner*, 382 U.S. 252, 255–56, 86 S.Ct. 335, 337–38, 15 L.Ed.2d 304 (1965).

*Conclusion*

██ Accordingly, the decision of the board is *affirmed* with regard to claims 1–7 and 9–10, and *reversed* as to claim 8.

MODIFIED.

**23.** The subject matter of the counts won in an interference is made available as prior art within the meaning of that term in 35 U.S.C. § 103 against the losing party of the interference in order to settle the dispute between the parties once and for all. See *In re Bass, supra*, at 1375, 474 F.2d at 1302, 177 USPQ at 197 (Baldwin, J., concurring).