**AKTIEBOLAGET KARLSTADS MEK-ANISKA WERKSTAD and KMW–Johnson, Inc., Appellants,**

v.

**UNITED STATES INTERNATIONAL TRADE COMMISSION and Beloit Corporation, Appellees.**

**Appeal No. 82–21.**

United States Court of Appeals, Federal Circuit.

April 18, 1983.

John E. Dumaresq, New York City, for appellant. With him on brief were Frederick C. Carver and Thomas R. Nesbitt, Jr., New York City, and Dennis A. Adelson, Washington, D.C., of counsel.

Phyllis M. Smithey and Joel Junker, Washington, D.C., argued for Intern. Trade Com'n. With them on brief was Michael H. Stein, General Counsel, Washington, D.C.

William C. Stueber, Chicago, Ill. and Victor M. Wigman, Arlington, Va., argued for Beloit Corp. With them on brief were Steven H. Noll, Chicago, Ill., and Dirk J. Veneman, Beloit, Wis.

Before FRIEDMAN, RICH, BENNETT, MILLER and SMITH, Circuit Judges.

RICH, Circuit Judge.

This appeal is from the final determination of the United States International Trade Commission (ITC) of November 18, 1981, in Investigation No. 337–TA–82A, USITC Publication No. 1197 (November 1981), entitled "In the Matter of Certain Headboxes and Papermaking Machine Forming Sections for the Continuous Production of Paper, and Components Thereof." We affirm in part, reverse in part, vacate in part, and remand.

The underlying basis of the ITC's investigation resides in two patents owned by appellee Beloit Corporation (Beloit), a leading domestic manufacturer of papermaking machinery. They are Reissue patent No. 28,269 (the '269 patent) granted December 10, 1974, a reissue of original patent No. 3,607,625 to Hill, Parker, and Hergert (the '625 patent), issued September 21, 1971, on application serial No. 698,633 filed January 17, 1968; and Verseput patent No. 3,923,593 (the '593 patent), issued December 2, 1975, on application serial No. 434,048 filed January 17, 1974, as a continuation-in-part of an earlier application filed December 3, 1971. Both of these patents in suit issued to Beloit as assignee. These two patents, '269 and '593, were held to be infringed by the importation and sale of apparatus of appellants, a Swedish manufacturer of papermaking machinery and its domestic licensee (herein jointly KMW).

There was a prior related investigation, No. 337–TA–82, 213 USPQ 291 (1981), based on the same underlying facts, in which the

President of the United States, on June 8, 1981, disapproved, for policy reasons, the ITC's determination pursuant to section 337(g)(2) of the Tariff Act of 1930, as amended, 19 U.S.C. § 1337(g)(2). In an explanatory statement, the President said:

My decision does not mean that the patent holder in this case is not entitled to a remedy. However, I do not have the authority to revise the USITC's remedy. An exclusion order directed only to the respondent's products, or a narrowly drafted cease and desist order would appear to be entirely justified and appropriate. I, therefore, strongly urge the Commission to take such action expeditiously on its own motion.

Thereafter the ITC instituted the present investigation, which was to be based, however, on the record compiled in the prior investigation with no issue already addressed to be relitigated absent new evidence and good cause. The ITC again determined there had been a violation of § 337 and issued a new exclusion order, the relevant portion of which reads:

1. Multi-ply headboxes and papermaking machine forming sections for the continuous production of paper, and components thereof or spare parts therefor, manufactured by Aktiebolaget Karlstads Mekaniska Werkstad, of Karlstad, Sweden, or any of its affiliated companies, parents, subsidiaries, or other related business entities, or their successors or assigns, which infringe claims 1, 12, 15, 16, or 22 of U.S. Letters Patent RE 28,269 and claims 4, 5, or 6 of U.S. Letters Patent 3,923,593 are excluded from entry into the United States for the remaining term of the patents, except where such importation is licensed by the patent owner;

2. KMW papermaking machine forming sections which are imported individually and not in combination with multi-ply headboxes are not subject to this order.

## Issues

The issues presented by this appeal are:
1. The validity of the claims in suit;
2. Infringement of those claims;
3. Injury to the domestic industry under § 337;
4. Whether appellants have been improperly denied procedural rights in the second investigation.

## Background

The papermaking machines here involved are large, costly devices designed to run continuously at very high speeds. The papermaking machine component most directly involved herein is the headbox, which is the part which delivers a slurry of paper pulp and water, known as paper stock, to a surface where it is formed and dried, known as the wire. The headbox must deposit the stock on the wire very uniformly. Otherwise, the machine will produce paper having streaks, clumps of fiber, or uneven tensile strength.

The paper these machines produce may be either single ply or multiple ply (multi-ply). A machine designed to produce single ply paper is referred to as a single ply machine, and its headbox a single ply headbox. Similarly, a machine designed to produce multi-ply paper is referred to as a multi-ply machine, and its headbox a multi-ply headbox.

KMW's allegedly infringing headboxes, all of which were multi-ply headboxes, may be understood from the following figures based upon Beloit's Exhibit "A". It is a diagrammatic, sectional, side view of the headbox portion of a papermaking machine shown as adapted to feed liquid paper stock into the space between the endless wire belts of a twin-wire type of paper former, the belts travelling around the supporting rolls marked I.

Stock flows from the three header inlets S at the bottom of the drawing to a preslice area R and then into slice chamber B. The slice chamber is divided by trailing elements or vanes D and E, pivotably mounted at F at their upstream ends. The downstream ends of the trailing elements are unattached and positioned by the pressure on them exerted by the flowing stock. The trailing elements extend transversely (perpendicular to the figure) the entire width of the slice chamber, thus dividing the slice chamber into a plurality of relatively shallow passages. The embodiment shown in the figure has come to be known as the "short vane" structure because the vanes and associated structures are wholly contained within the slice chamber B. Another embodiment, the "vane without foil" embodiment, delivers air at the trailing edge of the vane through air passages within the vane itself, thus creating an "air wedge" at the trailing edge. In a third embodiment, the "vane with foil" embodiment, long foil members extend from the trailing edges of the vanes D beyond the confines of the slice chamber.

The small figure marked "SECTION A–A" is a broken or lengthwise contracted view through the slice chamber B and the vanes D and E. The space inside the chamber which contains the paper stock is called the "pond" and is closed at either end by what are called "pondsides," shown at J. The vanes or trailing elements, as will be seen, extend from pondside to pondside, continuously, the break in the middle of the drawing being a drafting convention indicating that a central portion of the chamber has been omitted for convenience of illustration. The floating vanes D and E, attached only at their upstream ends, are the feature with which we are here principally concerned.

### The Patent Claims in Issue

As enumerated in the ITC's exclusion order, five claims of the '269 patent are in issue, namely, 1, 12, 15, 16, and 22. Three

claims of the '593 patent are in issue, 4, 5, and 6.

The invention disclosed in the '269 patent by the joint inventors Hill, Parker, and Hergert (Hill et al.), who filed the first of the applications in the series before us, is illustrated as embodied in a single ply headbox arranged to flow paper stock onto the forming wire belt of a Fourdrinier type papermaking machine, which has a single wire belt or screen through which the water of the paper stock is removed, leaving a fiber mat, subsequently further processed to make finished paper. The gist of the invention of the claims in suit is the use in the headbox slice chamber of one or more trailing elements, anchored at their upstream ends, self-positionable through fluid pressure, and extending all the way across the slice chamber, i.e., pondside to pondside. There is nothing in these claims which limits this invention to use in a single ply headbox; it can be and is used in the same way in a multi-ply headbox for the same advantages. The '269 patent claims in suit will be more easily understood in connection with an illustration. We reproduce Figs. 2, 3, and 5 of patent '269:

FIG. 2

FIG. 3

FIG. 5

Explaining the essentials, 40 is a headbox with an inlet header 43 feeding stock to a perforated plate 44 at the upstream end of slice chamber 47 having slice S2. Components 50, 51, and 52 are the trailing elements anchored at their upstream ends to plate 44. Fig. 3 is a section on the line III–III looking to the left. Fig. 5 is a plan view of element 50. Stock flowing out of S2 is deposited on Fourdrinier wire 53 carried around roll 52 and moving to the right. The involved claims read as follows:

1. In a headbox for delivering stock to a forming surface, the headbox having a slice chamber and a slice opening, the improvement comprising a plurality of trailing elements positioned in the slice chamber, each of said elements extending transversely of said headbox from pondside to pondside, means anchoring said elements only at their upstream ends at locations spaced generally perpendicular to the stock-flow stream with their downstream portions unattached and constructed to be self-positionable so as to be solely responsive to forces exerted thereon by the stock flowing towards the slice.

12. In a headbox for delivering stock to a forming surface, the headbox having a slice chamber and a slice opening, the improvement comprising a trailing element positioned in the slice chamber, said element extending transversely of said headbox from pondside to pondside, means anchoring said element only at its upstream end with its downstream portion unattached and constructed to be self-positionable so as to be solely responsive to forces exerted thereon by the stock flowing towards the slice.

15. In a headbox for delivering stock to a forming surface, the headbox having a slice chamber and a slice opening, the improvement comprising:

perforate walls [sic] means mounted in said slice chamber transversely of said slice chamber and located in an upstream portion of said slice chamber, a plurality of rigid plates,

means for attaching the upstream ends of said plates to said wall means,

said plates extending transversely of said headbox from pondside to pondside and projecting downstream generally in the direction of stock flow,

and trailing elements attached to the downstream ends of said plates,

said elements being attached to said plates only at their upstream ends with their downstream portions unattached and constructed to be self-positionable so as to be solely responsive to forces exerted thereon by the stock flowing towards the slice.

16. The structure of claim 15 wherein said elements are in the form of sheets extending transversely of said headbox.

22. In a headbox for delivering stock to a forming surface, the headbox having a slice chamber and a slice opening, the improvement comprising:

perforate wall means mounted in said slice chamber and located in an upstream portion of said slice chamber, a rigid plate,

means for attaching the upstream end of said plate to said wall means,

said plate extending transversely of said headbox from pondside to pondside and projecting downstream generally in the direction of stock flow,

and a trailing element attached to the downstream end of said plate,

said element being attached to said plate only at its upstream end with its downstream portion unattached and constructed to be self-positionable so as to be solely responsive to forces exerted thereon by the stock flowing towards the slice.

Beloit's Verseput '593 patent is an application of the Hill et al. invention of the '269 patent to a machine for making multiple ply paper, for example, a paper having a core of one kind of stock integrated with surface layers formed from a different stock, all three layers being laid down on the wire or between the wires of a forming section at the same time from the same headbox. This requires means for feeding different stocks simultaneously to the headbox and keeping them separated until they are delivered from the slice. It requires, in other words, a multi-ply headbox. Fig. 2 of the patent diagrammatically illustrates the headbox feeding multiple stocks from the slice into the space between twin forming wires, and Fig. 3 is a section through a 3-ply paper produced thereby. The claims in issue follow the drawings.

Fig. 2

Fig. 3

WOOD FIBERS
HIGH ASH
WOOD FIBERS

4. In a machine for making a multiply web such as a paper from stocks having a slurry of fibers in a liquid carrier, the combination comprising:

a foraminous forming surface for receiving a liquid stock and dewatering the stock;

a headbox having a slice chamber formed by slice walls terminating in slice lips which form a slice opening for directing a jet stream onto the forming surface; said slice lips extending substantially the same distance toward said surface; said headbox also having a preslice chamber immediately upstream of the slice chamber; a first rigid partition extending across said preslice chamber dividing the preslice chamber into multiple stock chambers;

a second partition extending across said slice chamber forming a continuation of said first partition and dividing the slice chamber into multiple stock chambers to extend to the slice opening; said second partition being supported

only at its upstream end with its downstream portion unattached and constructed to be self-positionable so as to be responsive to forces exerted thereon by the stock flowing toward the slice so that the stocks from the multiple chambers exit through the slice opening at uniform velocity;

and means for supplying stocks of different characteristics to each of said multiple stock chambers in the preslice chamber.

5. In a machine for making a multiply web such as a paper from stocks having a slurry of fibers in a liquid carrier constructed in accordance with claim 4:

wherein said forming surface is comprised of a first looped traveling forming wire and a second looped traveling forming wire;

and guide means within said wires guiding the wires to provide a forming throat receiving stock from said slice followed by a forming run between the said wires.

6. In a machine for making a multiply web such as a paper from stocks having a slurry of fibers in a liquid carrier constructed in accordance with claim 4:

including a third partition extending across said preslice chamber so that the headbox is divided into at least three stock chambers comprising two outer chambers and one intermediate chamber and including a fourth partition being a continuance of the third partition which extends to the slice opening and is self-positioning.

*Prior Art References*

German patent No. 899,896 published in 1953 discloses a multi-ply headbox as shown in the following drawing:

The illustrated headbox has upper flow-out nozzle 11 and lower flow-out nozzle 18, between which is separating tongue 19 which can be rotated about pivot 20 and also adjusted longitudinally to some extent. The rotatable separating tongue delimits the

outlet cross-sections of the two flow-outs, and thus, the patent teaches, adjusts the relative amount of pulp expelled from one with respect to the other. Note that there are two "breastboxes" 5 and 6, which are supplied pulp separately from lines 7 and 8, respectively, thus enabling the making of multi-ply paper.

French patent No. 1,490,429 granted in 1967 likewise discloses the headbox end of a multi-ply papermaking machine. Figure 2 is reproduced:

Fig. 2

Shown are pulp distributors I and II; separated by lip 15 which is pivoted at 51 and is turned to regulate slot 17 between lip 15 and screen 16 to obtain the desired mixture of the stocks from distributors I and II, respectively. As was true of the device disclosed in the German patent, the headbox of the French patent has separate stock supply systems, starting with distribution conduits 9 and 9′, and collectors 10 and 10′. It differs from the German patent in that the two stocks supplied are laid on screen 16 in succession, one after the other, instead of simultaneously.

A third patent asserted by KMW to be prior art is U.S. patent No. 3,939,037 (the '037 patent) issued in 1976 to Hill, a named coinventor in the '269 patent, as a sole inventor on application serial No. 451,-225, which was a continuation of a continuation-in-part of a division of the application which matured into the patent reissued as the '269 patent. As might be expected, the specifications of the '037 and '269 patents strongly resemble one another. Specifical-

ly, the '037 patent teaches a headbox with self-positionable trailing elements, and mentions that

* * * it may be more convenient to have the flexible members * * * extend transversely of the slice chamber in the form of a full width sheet * * * where the transverse dimension of the preslice flow chamber is relatively narrow.

As developed later in this opinion, it is necessary to make a distinction between Hill's sole invention (later explained) as "prior art" under 35 U.S.C. §§ 102(g)/103 and the *disclosure* of the Hill '037 patent, as such, which is not § 103 "prior art."

Finally, the '269 patent is § 103 "prior art" with respect to the '593 patent.

## OPINION

*The '269 Reissue Patent in Suit*

*Validity*

The ITC agreed with the presiding officer's finding that KMW had not rebutted

the '269 patent's presumption of validity, and so adopted his determination that the '269 patent is valid and enforceable.

As to the '037 patent, the presiding officer concluded

> * * * that the '037 patent does not teach or suggest the use of trailing elements which are full width sheets extending pondside to pondside in any use other than a narrow-width headbox.

Thus, he regarded the subject matter of claims 1 and 12 of the '269 patent as patentably distinct from the invention disclosed in the '037 patent. He was also persuaded by the fact that the examiner who ultimately allowed the '269 patent had made, but later withdrew, a rejection based on the '037 patent. The presiding officer appreciated that the '037 and '269 patents originated from the same application, opining that "this history would seem to weaken [KMW's] contention that the '037 patent truly constitutes prior art over [sic, against] the '269 patent."

As to the German patent, the presiding officer thought it more reasonable to conclude that the separating tongue disclosed therein, judging from its function, is fixed rather than free. He noted the testimony of KMW's expert, Mr. Eric Stenberg, that regardless of whether the disclosed separating tongue is fixed or free, it would have been obvious to one of ordinary skill in the art that the disclosed separator tongue could be free, but found more persuasive the testimony of Beloit's expert, Dr. Waller, who testified that it would have been unthinkable to one of ordinary skill in the art to have a free member within the slice chamber. The presiding officer also thought it significant that the German patent had been considered by the patent examiner who ultimately allowed the '269 patent. In addition, the presiding officer noted the presence of several indicia of nonobviousness including the commercial success of papermaking machines incorporating the claimed invention and the failure of others to solve the long-standing problems solved by the claimed invention. As to the French patent, the presiding officer thought it

teaches no more than the conventional thinking that any dividing element within the slice chamber had to be fixed in position.

KMW contends that the subject matter of claims 1 and 12 of the '269 patent is anticipated by the '037 patent's disclosure of the use of full width trailing elements in a narrow headbox. It also contends that the invention claimed in the '269 patent would have been obvious from the German patent. Furthermore, it contends that the subject matter of claims 15, 16, and 22 of the '269 patent would have been obvious from the combined teachings of the '037 and French patents. It maintains that the presiding officer made two fundamental errors in determining nonobviousness. First, it contends that he treated self-positionable trailing elements as a "basis for patentability" of the '269 patent, when in fact they were part of the prior sole invention of Hill. Second, the presiding officer is said to have accepted Beloit's contention that its headbox solved several long-standing problems in the papermaking art.

Underlying KMW's argument of anticipation is the premise that the '037 *patent* is prior art with respect to the '269 patent. KMW cites no statutory basis for this premise nor is one presented by the facts of record. The '037 and '269 patents, being derived from the same parent application, have the *same* effective filing date. It apparently is based instead on Beloit's statement that "the ['037] patent is unquestionably the most pertinent prior art with respect to the headbox claimed in the '269 patent." Appellants present this statement as an admission that the '037 *patent*, as such, is prior art.

Beloit admits making the quoted statement but disagrees with KMW's interpretation. When asked at oral argument whether Beloit admitted the '037 *patent* was technical prior art, its counsel responded:

> Only as far as the dangling or trailing element concept [is concerned]. It is not technical prior art for the entire wording of the specification because the two cases were copending. They go back to exactly

the same filing date. They derive from the same basic application. You cannot take the words, all the words of the specification, and say they are prior art because you cannot use the words and go to a date earlier than the Hill et al. ['269] patent. And we say they are prior art, that Hill alone ['037] is prior art, because it taught the dangling element, but that was the generic concept of an unsupported self-positionable element.

Thus, the parties agree that there has been an admission, but disagree over what has been admitted. In resolving this disagreement, we cannot take an arguably ambiguous statement and construe it in the manner most detrimental to Beloit, regardless of its explanations and attempted clarifications. Rather, it is necessary to consider everything that has been said about what is prior art. *In re Nomiya,* 509 F.2d 566, 571, 184 USPQ 607, 612 (Cust. & Pat. App.1975). Beloit's statements of record in this case include those already quoted, as well as a longer discussion of what part of the '037 patent is prior art, similar to its remarks at oral argument, in its post-hearing brief to the Commission, as well as remarks in its brief and additional remarks at oral argument. These statements taken together demonstrate that Beloit has consistently insisted that Hill alone did not invent a headbox having full width trailing elements, despite the fact that Beloit has used some language which might suggest otherwise. They lead us to conclude that Beloit has admitted only that Hill's work was prior to that of the joint inventors, and that he invented a headbox having self-positionable trailing elements, but not full width trailing elements. The record, taken as a whole, supports only this view.

■ Having determined the extent of Beloit's admission of Hill's prior invention, it must now be resolved whether, as KMW alleges, Hill alone invented *more* than Beloit has admitted. Specifically, KMW argues that the description of full width trailing members in the '037 patent, in which Hill is named as the sole inventor, demonstrates that Hill by himself invented a headbox incorporating such full width trailing members. The short answer to this argument is that there is no presumption, or any reason to assume, that everything disclosed in a patent specification has been invented by the patentee. *In re Clemens,* 622 F.2d 1029, 1036, 206 USPQ 289, 297 (Cust. & Pat.App.1980). *See In re DeBaun,* 687 F.2d 459, 214 USPQ 933 (Cust. & Pat. App.1982). This is especially significant in this case. The embodiment comprising full width trailing members is an improvement on, and thus the best mode of practicing, what has been conceded by Beloit to be Hill's prior invention. This improvement was unquestionably known to Hill, who participated in its development. Thus, 35 U.S.C. § 112, which requires an inventor to set forth the best mode contemplated by him of carrying out his invention, required Hill in this instance to retain the description of full width trailing sheets in his application when it was divided out of the joint application, regardless of whether it was his invention. Under these circumstances, there is no reason to believe that Hill's invention is anything more than Beloit has conceded.

■ The above analysis leads us to conclude that Beloit has admitted, and admitted accurately, that Hill by himself invented a headbox having self-positionable trailing elements before the invention of other embodiments of that concept by Hill, Parker, and Hergert; but that his headbox did *not* have full width trailing elements. This is an admission of prior invention by another in this country, and so Hill's headbox becomes prior art by virtue of this admission and 35 U.S.C. § 102(g). Hill's headbox is therefore prior art for the purpose of determining obviousness under 35 U.S.C. § 103, especially here where the joint inventors Hill et al. were undeniably aware of Hill's prior work, and the evidence of priority, an admission, is conclusive. *In re Clemens,* 622 F.2d 1029, 206 USPQ 289 (Cust. & Pat.App.1980).

■ We must now decide whether the invention claimed in the '269 patent would have been obvious to one of ordinary skill in

the art from knowledge of the Hill invention, the German patent, the French patent, or any combination of their teachings. In so deciding, it does not matter that we have, as a matter of law, defined the Hill invention more narrowly than did the presiding officer, who apparently believed, as we do not, that Hill by himself invented full width trailing members, at least as used in a narrow headbox, because his patent describes it. Obviousness is a legal conclusion based on factual determinations and not a factual determination itself. *General Motors Corp. v. ITC*, 687 F.2d 476, 480, 215 USPQ 484, 487 (Cust. & Pat.App.1982), *cert. denied,* —— U.S. ——, 103 S.Ct. 729, 74 L.Ed.2d 953 (1983). The factual determination at issue concerns the scope and content of the prior art. We must uphold this factual determination if and only if it is both arrived at through the proper application of the relevant law and supported by substantial evidence. Our disagreement with the presiding officer's view concerning the scope and content of the prior art is on the former grounds; the '037 patent is not prior art with respect to the '269 patent as a matter of law. Despite this disagreement, we may nevertheless affirm the legal conclusion of the ITC with respect to obviousness if we agree with it, for it is, ultimately, that conclusion and that conclusion alone which we review.

With regard to the specific issue now under consideration, whether the invention claimed in the '269 patent would have been obvious to one of ordinary skill in the art when made, our conclusion, the same as that of the ITC, is that it would not have been. Knowledge of Hill's sole invention would not have suggested a headbox having the pondside-to-pondside elements recited in the '269 patent claims in suit. The separating tongue of the German patent is disclosed to serve, and actually serves, a purpose completely different from that of the self-positionable trailing elements of the claimed invention. As noted earlier in this opinion, adjustable tongue 19 determines by its fixed setting the relative outflow from the two pulp supplies whereas the '269 trailing sheets do nothing of the

kind, being free when the headbox containing them is in use. From this it follows that a combination of the teachings of the Hill invention and the German patent does not render the claimed invention obvious within the meaning of § 103. With regard to the French patent, the lip disclosed therein is also fixed rather than free, so that the French patent teaches nothing more material than what can be learned from the German patent.

Finally, there remains the dispute of the parties over the existence and effect of indicia of nonobviousness, or so-called "secondary considerations," associated with the '269 headbox. Assuming, arguendo, that KMW is correct in contending that there are reasons to discount them, we nevertheless adhere to the legal conclusion that the '269 patent is valid, based on the analysis set forth above.

*Infringement*

The presiding officer concluded that KMW's short vane and vane without foil structures literally infringe claims 1 and 12 of the '269 patent. He also found that the vane with foil structure literally infringes claims 1, 12, 15, 16, and 22 of the '269 patent. The ITC agreed, and so adopted the findings and conclusions of the presiding officer respecting literal infringement.

With respect to all claims and embodiments, KMW attacks the ITC's determination of literal infringement by contending that its own headbox so resembles the prior art that the claims of the '269 patent cannot read on their headbox and still be valid. We reject this argument. Our finding above, that the '269 patent is valid notwithstanding the prior art, is premised on the conclusion that any apparatus within its claims would not have been obvious at the time the invention was made. An affirmative finding of literal infringement therefore necessarily means that KMW's headbox is not as similar to the prior art as KMW contends. KMW also argues that the ITC erred in adopting the presiding officer's conclusion that the '269 patent claims are entitled to a broad construction because

of the pioneer status of the invention, commercial success, and patent policy. Specifically, KMW contends that the invention claimed in the '269 patent contributed very little to the art, so that its claims should be limited to the embodiments described in the specification. We reject this contention for to accept it would be to read limitations into the claims which they do not contain. Apart from that contention, KMW does not even suggest, nor can we discern for ourselves, any reason for reading claims 1 and 12 so narrowly that they do not read on headboxes incorporating KMW's short vane and vane without foil structures. We therefore affirm the ITC's determination that these headboxes literally infringe claims 1 and 12.

As to the vane with foil structure, KMW argues that the ITC ignored several features of a headbox incorporating such elements which remove it from the scope of the involved claims. We have considered all of these features, and find that the only one arguably applicable to the claims is that the trailing elements *with foils* extend through and beyond the slice opening, so that the trailing member is not "constructed to be self-positionable so as to be solely responsive to forces exerted thereon by the stock flowing *towards the slice*" as recited in the claims. (Emphasis ours.) Reading the claims in light of the specification, however, we conclude that the phrase "flowing towards the slice" merely expresses a direction of stock flow in terms of a reference point—the slice—a direction that one skilled in the art would readily understand to remain the same even though that reference point has been passed. That is to say, even though a small part of the stock minimally affecting the position of the whole trailing member may have passed through the slice, and so is technically flowing *away* from the slice, the position of the trailing member is for the most part, if not altogether, still determined by forces exerted by stock flowing towards the slice. We reach this conclusion whether or not the claims are given a broad construction. Based on this conclusion, we affirm the ITC's determination that the vane with foil

embodiment of KMW's headbox literally infringes claims 1, 12, 15, 16, and 22 of the '269 patent.

*The '593 Patent*

*Validity*

The '593 Verseput patent matured from an application which was a continuation-in-part of an application filed December 3, 1971. The presiding officer found that the invention described and claimed in the '593 patent was actually reduced to practice as early as June 7, 1970. The '269 patent, just discussed, is a reissue of patent No. 3,607,-625 dated September 21, 1971, and applied for January 17, 1968. The '269 patent is therefore prior art with respect to the '593 patent by virtue of 35 U.S.C. § 102(e). In fact, Beloit concedes it to be the most pertinent prior art, and states in its brief:

> These same principles utilized in the '269 headbox for making single ply paper were found by Mr. Verseput to be exploitable in the manufacture of multiply paper wherein different types of papermaking stock are supplied in a multiply headbox between the self-positionable elements. Again, because the self-positionable elements extend pondside to pondside the different types of stock are maintained segregated in the headbox so that no mixing of the stocks occurs, and upon exiting the headbox the absence of shear forces due to the equal velocities of the adjacent stock flows achieves just the right amount of intermingling of fibers between adjacent layers so as to provide good bonding without destroying the layer purity.

Thus, as the presiding officer put it, the '593 patent describes a headbox "whose structure and functions, generally speaking, are substantially the same as the Converflo single layer headbox described in the '269 patent, modified by suitable partitions to convert the single ply headbox into a multilayer headbox." Thus, the question is whether this innovation would have been obvious to one of ordinary skill in the art as of June 7, 1970.

After reviewing the exhibits and testimony of record and the arguments of counsel, we conclude that the headbox claimed in the '593 patent would have been obvious from the '269 patent in view of the German patent. Certainly, *how* to convert the single ply headbox described in the '269 patent into a multi-ply headbox would have been clear from the German patent's teaching of a multi-ply stock feeding and delivery system. As Beloit's technical expert, Professor Waller, acknowledged during cross-examination, it would have entailed only supplying two sources of stock, dividing the pre-slice chamber, and extending one of the trailing members all the way to the slice opening. Given the obviousness of how to construct such a headbox, any non-obviousness must arise from the act of realizing that constructing such a headbox would be advantageous. That realization, however, would have been obvious as well.

We are aware that Professor Waller also testified that because of certain technical considerations, such as problems produced when the stocks have a relative velocity at their confluence, it would have been, and in fact was, surprising to one of ordinary skill in the art that the '593 headbox worked as well as it did. We appreciate that this testimony went essentially unchallenged and would normally show that it would not have been obvious to combine the teachings of the '269 and German patents. In the circumstances of this case, however, the prior art '269 patent teaches that at least two major advantages inure from use of the headbox described therein, those being a high degree of fiber dispersion and a low level of turbulence in the discharge jet. One skilled in the art, deemed to be aware of these teachings, would have had ample reason to take the natural and obvious step of carrying them over to the closely related, well known multi-ply papermaking art, despite any apprehension of problems caused by a potential relative velocity of stocks. Apparently there were no such problems.

In reaching the above conclusion, we of course have given effect to the statutory presumption of validity accorded the '593 patent by 35 U.S.C. § 282. In this case,

however, there is prior art, the German patent, which was not cited by the examiner but was conceded by Beloit's technical expert to be, in certain crucial aspects, more pertinent than art the examiner did cite. As stated in *Solder Removal Co. v. ITC*, 582 F.2d 628, 199 USPQ 129 (Cust. & Pat.App. 1978),

> Rebuttal of the presumption may be more easily had and more often achieved in reliance on prior art more pertinent than that considered by the examiner; but whether rebuttal is achieved requires careful consideration of whether the prior art relied upon does in truth render the claimed invention anticipated or obvious.

Our careful consideration of the prior art in this case leads us to conclude that KMW has carried its burden and effectively rebutted the presumption.

We have also taken into account the evidence of long-felt need and commercial success, but in this instance we deem it insufficient to persuade us of validity. The dominant reason is that the '269 headbox, which is prior art crucial to our finding of invalidity, itself achieved commercial success and satisfied a long-felt need. Thus it undoubtedly contributed to the success of the '593 headbox, which incorporates its teachings, diminishing the weight usually given to success of an improvement invention.

Thus, as stated at the outset, we hold the claims in suit of the '593 patent invalid for obviousness under § 103 and reverse the contrary determination of the ITC.

*The Injury To a Domestic Industry Determination*

The ITC defined the domestic industry as that portion of Beloit's facilities which exploits *both* patents, and determined that KMW's unfair acts have a tendency to substantially injure the domestic industry. This determination was premised, in part, on the antecedent determinations that both the '269 and '593 patents are valid and infringed. Our contrary conclusions with respect to the '593 patent thus may have an effect on the continued propriety of the ITC's injury determination,

including its definition of domestic industry. We therefore vacate that determination and remand this case to the ITC to reconsider, if necessary, its injury determination and definition of domestic industry in light of the foregoing.

*Alleged Deprivation of Procedural Rights*

As mentioned at the outset, after the President disapproved on policy grounds the order arising from the first investigation, the ITC initiated a second investigation on its own motion. The notice of this investigation stipulated that no issue concerning the violation of section 337 addressed in the first investigation would be relitigated unless (1) a party filed a petition presenting new evidence concerning the violation alleged in the first investigation and showing good cause for relitigation, and (2) the ITC granted the petition. KMW thereafter petitioned the ITC to "introduce new evidence and to amplify and update the record." Specifically, KMW asked for permission to:

1) amplify the record to show that there has been head-to-head competition between Beloit's single layer headboxes which can be converted to make multilayer paper and KMW's multilayer headboxes which can be converted to make single layer paper;

2) amplify the record to show that the short-vane version * * * of the two KMW headboxes sold to Scott Paper Company was intended for use as a single layer headbox so that the "domestic industry" should have been broadened to include it in the prior investigation;

3) introduce evidence relating to the structure and operation of KMW's modified multilayer headbox and to obtain a determination that it does not infringe the claims of either of the patents; and

4) have discovery necessary to amplify and update the record on the issue of injury to a domestic industry.

KMW's petition was opposed jointly by Beloit and the Commission Investigative Attorney because it did not conform to the requirements enunciated in the notice of investigation. The ITC agreed, and so denied the petition.

KMW contends on appeal that the ITC's denial of its petition deprived it of its statutory right to present all defenses in an investigation. The statute relied upon is 19 U.S.C. § 1337(c), which provides in part that all legal and equitable defenses may be presented in all cases. Also implicated in the arguments on this point is 19 U.S.C. § 1337(g)(2), which provides in part that determinations disapproved by the President shall have no force or effect.

We are not persuaded that the ITC's actions in this case contravene any of the provisions of section 337. Section 337(c) was not violated; KMW had adequate opportunity to present its legal and equitable defenses, albeit during the first investigation. Thus, in this case, the ITC's violation determinations were based on a record compiled in a case where KMW could have the opportunity to and in fact did present its legal and equitable defenses. Also, the ITC set up a procedure to ensure that if evidence concerning additional defenses had arisen since the compilation of the record in the first investigation, the record could be expanded accordingly. KMW has not shown that the additional evidence it sought to introduce in the second investigation was not available in the first investigation. In the circumstances of this case, the ITC's actions satisfied section 337(c). Nor did the ITC violate section 337(g)(2); it did not give the *determination* arising out of the first investigation either force or effect. What it salvaged from the first investigation were the record and the findings and conclusions of the presiding officer. There is no statutory prohibition against giving them continued effect. Thus, the ITC's procedure in this case was not contrary to statute. When KMW presented a petition which was not in conformity with the conditions of the second investigation, and we agree with the ITC that it was not, the ITC properly denied it.

*Conclusion*

The findings of validity and infringement of the claims in suit of the '269 patent are

affirmed. The finding of validity of the claims in suit of the '593 patent is reversed. The determination of tendency to substantially injure a domestic industry is vacated, and the case is remanded for reconsideration in light of our finding of invalidity of the '593 patent. We find no error in the ITC's procedures in this case.

AFFIRMED IN PART, REVERSED IN PART, VACATED IN PART, AND REMANDED.